768 A.2d 140

**Ronald GERALD**

v.

**STATE of Maryland.**

**No. 596, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

March 7, 2001.

John L. Kopolow, Asst. Public Defender (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Patricia Jessamy, State's Atty. for Baltimore City on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and HOLLANDER and SONNER, JJ.

SONNER, Judge.

A jury in Baltimore City found Ronald Gerald, appellant, guilty of robbery with a deadly weapon, first degree assault, use of a handgun in the commission of a felony or crime of violence, possession of a firearm by a convicted felon, and lesser included offenses. The jury acquitted him of attempted murder in the first degree and of attempted murder in the second degree. The court then sentenced him to twenty-five years' incarceration for the first degree assault; twenty years' incarceration for the armed robbery, to run consecutively to the first degree assault sentence; twenty years' incarceration for the use of a handgun, to run consecutively to the first degree assault sentence, but concurrently with the armed robbery sentence; and five years' incarceration for possessing a handgun as a convicted felon, to be served consecutively to all the other sentences. Gerald appealed and presents four questions for our review:

I. Did the trial judge err in permitting appellant's accomplice to testify that documents imploring and threatening the accomplice to exculpate appellant were written by appellant?

II. Did the trial judge err by admitting an unidentified prisoner's extra-judicial statements concerning appellant's criminal past and criminal character?

III. Was the evidence legally sufficient to convict appellant of use of a handgun in the commission of a felony or crime of violence and possession of a handgun by a convicted felon?

IV. Must the conviction and sentence for first degree assault be merged into the conviction and sentence for robbery with a dangerous or deadly weapon?

We conclude that the first degree assault merged into the robbery, although the mandatory twenty-five-year sentence that the court attached to the assault stands, as it must reattach to the surviving robbery conviction. Otherwise, we affirm the judgments.

### *Background*

At approximately 4:00 a.m. on July 17, 1999, Baltimore City Police Officer John Ross met with Paul Cornish at Johns Hopkins Hospital. Cornish told Officer Ross that he was approached by a group of people, pushed off his bicycle, hit in the head with a shotgun, forced to his hands and knees, robbed of forty dollars from his pants pockets, and shot in the buttocks as he tried to stand up and run away. The hospital treated Cornish for a wound to the forehead and buttocks. Officer Ross then took Cornish to a police substation, where he was questioned about the attack. During the interview, Cornish looked out the window and exclaimed, "There goes one of them."

Officer Ross went outside and spoke with the passerby, Anthony Everhart. Although, initially, Everhart denied any knowledge of the attack, he eventually admitted that he "was there," but was not the person who actually shot Cornish.

Officer Ross placed Everhart under arrest and transported him to the Baltimore City Police Department Homicide Unit. Once there, he provided a statement, in which he explained that, in the early morning hours of July 17, 1999, he, Gerald, and three other people, were walking home from a night club when they came upon Cornish riding a bicycle. Gerald confronted Cornish, and they exchanged harsh words. Everhart began to walk away from the scene, towards his home, when he saw Gerald walk over to a black "school bag," pull out a sawed-off shotgun, and point it towards Cornish. Cornish began to run and Gerald chased him with the gun across the street. At that point, Everhart left the scene. As he approached his home, however, he heard a loud gunshot blast.

Everhart was charged with the armed robbery of Cornish. Pursuant to a plea agreement, he testified on behalf of the State at Gerald's trial. The agreement provided that, in exchange for his testimony, he would plead guilty to armed robbery and receive a suspended ten-year sentence and a three-year term of probation. Without the agreement, Everhart could have received a sentence of twenty years.

At trial, the State offered the testimony of Officer Ross, Everhart, and Cornish. It also presented Detective Ray Laslitt, who testified that Cornish picked Gerald out of a photographic array, and Tammy Williams, Gerald's former girlfriend, who testified that Gerald asked her to give false alibi testimony on his behalf. Additional facts will be provided below.

### Discussion

### I.

Gerald's first point of error concerns the authentication of two letters offered by the State and admitted into evidence. Gerald purportedly wrote the letters to Everhart while they were both in prison, awaiting trial. To introduce the first letter, the prosecutor asked Everhart if he recognized it, which he did, and then asked how he knew that Gerald wrote it. Everhart responded that the handwriting matched that of

a prior letter he had received from Gerald.[1] Over objection, Everhart then read the letter to the jury, in which Gerald declared, "We go to court in a week and a half and these people are trying to mash me because of you. You are not going to get any time at all because I talked to my lawyer and she told me so." He urged Everhart not to sign a *Hicks* waiver and to stop seeking protective custody. He also warned:

> We are alright son. They got nothing. But, if you do get some time, I'll take care of you and you know I've got money. There is no use for both of us going down. Especially me . . . Just don't testify against me and tell your lawyer, I'm not the one you were talking about, and I was not there . . . Do not tell people. It's a code we should go by. Telling on people can get a lot of people killed . . . Tear this letter up after you read it. Don't give it to the State's Attorney.

This first letter was not signed. It came in an envelope addressed to Everhart at prison, but with an incorrect identification number. The return address contained the name "Ronald Gerald" and his address at prison, including his correct identification number. When asked, "Do you know what the Defendant was talking about when he wrote you this [letter]," Everhart replied, "Yes."

In the second letter, which, over defense objection, Everhart also read to the jury, Gerald asked him to sign, notarize, and return an enclosed affidavit by the end of the week. By signing the affidavit, Everhart essentially would have retract-

---

1. This prior letter was not introduced into evidence. Throughout the transcripts, the parties refer to three letters, but it is unclear whether this prior letter was included in the count. Before jury selection, the defense moved *in limine* to exclude any of the letters written by prisoners. The State responded by describing three letters it planned to introduce. Gerald wrote two of those letters, and Juan Dean, who was serving a life sentence for murder, wrote the third letter. Dean, however, did not testify at Gerald's trial and the State did not move for admission of his letter. Thus, there seems to have been four letters, three which the State planned to introduce, and two of which were ultimately admitted.

ed his earlier statement identifying Gerald as the shooter. The second letter was signed "Ronald" and was addressed to Everhart with his proper identification number.

The court denied defense counsel's request to voir dire Everhart regarding the letters, although, on cross-examination, Everhart conceded that he had never seen Gerald's handwriting or signature outside of the three letters. Defense counsel then inquired: "In fact, those letters or those envelopes could have been written by anybody, couldn't they have?" Everhart answered, "Yes." Defense counsel then moved for a mistrial, arguing that the letters were not authenticated and lacked trustworthiness. The court denied the motion, stating:

> The letters are admissible. The totality of the evidence is sufficient to attribute authorship to this Defendant. It is for the jury to weigh that evidence and determine whether or not from the evidence ... this Defendant is, in fact, the author of those letters.

Gerald argues on appeal that the trial court abused its discretion in admitting the letters in the first instance, or by not declaring a mistrial once Everhart admitted that he had never seen Gerald's writing outside of the letters. He claims Everhart identified the penmanship on the letters by comparing them to another writing that was not itself authenticated, in contravention of § 10–906 of the Courts Article. MD.CODE (1998 Repl.Vol.) Cts. & Jud. Proc., § 10–906. The State responds that the court properly admitted the letters, pursuant to Maryland Rule 5–901(b)(4) (2000). We consider each provision in turn.

Section 10–906 states in part:

> (a) *In general.*—... evidence is admissible in any proceeding to prove the execution of a written instrument attested by one or more subscribing witnesses in the same manner as the instrument might be proved had it not been attested. *Evidence of a disputed writing is admissible and may be submitted to the trier of facts for its determination as to genuineness.*

(Emphasis added.) Gerald directs us to the italicized portion of the statute, which evolved as an exception to the common law. Historically, judges and juries were not considered competent to compare handwriting samples to determine genuineness. *DiPietro v. State,* 31 Md.App. 392, 395, 356 A.2d 599 (1976) (quoting 80 A.L.R.2d 274). Courts across the country adopted an exception to this common law rule that allowed comparison "when a proved or admitted standard used for comparison with the disputed writing was already in evidence for other purposes." *Id.; see also Williams v. Drexel,* 14 Md. 566, 572 (1860).

In Maryland, the exception was first codified in 1825. 1825 Md. Laws, ch. 120. It evolved to read:

> Comparison of a disputed writing with any writing proved to the satisfaction of the court to be genuine shall be permitted to be made by witnesses, and such writings and the evidence of witnesses respecting the same may be submitted to the court and jury, or the court, as the case may be, as evidence of the genuineness or otherwise of the writing in dispute.

Md.Code (1957) Art. 35, § 12; *see also Parker v. State,* 12 Md.App. 611, 280 A.2d 29 (1971)(applying the statute). In 1973, the General Assembly changed the exception to its current form. 1973 Md. Laws, Spec. Sess., ch. 2, § 1. Although the alterations were extensive, "the intended change was in style, not in substance." *DiPietro,* 31 Md.App. at 398, 356 A.2d 599. Thus, although § 10–906 speaks to the genuineness of writings, primarily, it renounces the common law rule that prohibited judges and juries from comparing handwriting samples.

■ Regardless of the history and purpose of § 10–906, the State contends the court did not admit the letters based on a comparison with other writings or on Everhart's opinion as to Gerald's handwriting. In its view, the court found the documents to be authenticated pursuant to Maryland Rule 5–901(b)(4), circumstantial evidence. Maryland Rule 5–901 provides in part:

(a) **General provision.** The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

(b) **Illustrations.** By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this Rule:

(1) Testimony of witness with knowledge. Testimony of a witness with knowledge that the offered evidence is what it is claimed to be.

(2) Non-expert opinion on handwriting. Non-expert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation.

(3) Comparison with authenticated specimens. Comparison by the court or an expert witness with specimens that have been authenticated.

(4) Circumstantial evidence. Circumstantial evidence, such as appearance, contents, substance, internal patterns, location, or other distinctive characteristics, that the offered evidence is what it is claimed to be.

Section (a) establishes that to admit a writing as authenticated, a judge must conclude that a reasonable jury could find the evidence to be what its proponent claims it to be. *See* Lynn McLain, Maryland Rules of Evidence, Rule 5–901 (1994) (noting that the standard of proof for authentication is the same standard as found in Maryland Rule 5–104(b)). As McCormick explains:

[T]he authenticity of a writing or statement is not a question of the application of a technical rule of evidence. It goes to genuineness and conditional relevance, as the jury can readily understand. Thus, if a prima facie showing is made, the writing or statement comes in, and the ultimate question of authenticity is left to the jury.

2 McCormick on Evidence § 227 (John W. Strong ed.1999). A trial judge's decision to admit or exclude evidence will not be set aside absent an abuse of discretion. *CSX Transp. v.*

*Continental Ins. Co.,* 343 Md. 216, 251–52, 680 A.2d 1082 (1996) (citations omitted); *Barnes v. Rosenthal Toyota, Inc.,* 126 Md.App. 97, 108, 727 A.2d 431 (1999).

 We agree with the State that the circuit court admitted the letters pursuant to Rule 5–901(b)(4) and that it did not abuse its discretion in doing so. The court admitted the letters based on the "totality of the evidence," which means the totality of circumstances—or circumstantial evidence. It followed Rule 5–901(a) by admitting the letters after finding "sufficient" evidence "to attribute authorship to [Gerald]," but then allowing the jury to weigh that evidence to determine the ultimate question of authenticity. Moreover, even if the trial court improperly admitted the evidence under § 10–906, we would affirm the judgment because the court properly could have admitted the evidence under Rule 5–901(b)(4). An appellate court will generally affirm when the trial court reaches the right result for the wrong reason. *Robeson v. State,* 285 Md. 498, 502, 403 A.2d 1221 (1979), *cert. denied,* 444 U.S. 1021, 100 S.Ct. 680, 62 L.Ed.2d 654 (1980); *Hurt v. Chavis,* 128 Md.App. 626, 640, 739 A.2d 924 (1999); *Pope v. Board of Sch. Comm'rs,* 106 Md.App. 578, 591, 665 A.2d 713 (1995).

As the State explains in its brief, the facts before the court were that:

> [t]he author of the first letter referred to 'our case,' knew about Everhart and Gerald's court date 'in a week and a half,' knew that Everhart had agreed to testify for the State, knew that Everhart's 'Hicks' date was coming up, and knew that Everhart was seeking protective custody . . . The affidavit accompanying the second letter referred to Everhart's and Gerald's court date 'on the 24th of this month' and the date of Everhart's taped statement to police. The affidavit also evidenced knowledge that, in his statement, Everhart had referred to the shooter as 'Reds' . . . Finally, Gerald was the only person who would have benefitted had Everhart succumbed to the threats and retracted his statement.

Gerald retorts in his reply brief that "[t]he facts alleged, the names of persons involved, possible legal strategies, and approaching court dates are surely frequent topics of conversation" in pretrial detention facilities. Thus, he argues, any inmate familiar with Gerald and Everhart could have written the letters. He even implies that Everhart himself forged the letters because, once he agreed to testify for the State, he and Gerald became antagonists.

Gerald quotes with approval 5 Weinstein's Evidence § 901.06[2] at 901–28 (1999):

> A writing can be shown to have emanated from a particular person or business by the fact that it would be unlikely for anyone other than the purported writer to be familiar with its subject matter and content. For this principle to operate, the writing must deal with a matter sufficiently obscure or particularly within the knowledge of the asserted author so that the contents of the writing were not a matter of common knowledge.

In Gerald's view, the facts in the letters were "common knowledge" within the prison population and not "sufficiently obscure" to warrant the letters' admission. Given the standard of proof required under Rule 5–901 and our deferential standard of review, we disagree. The letters contained specific and technical details of the case so that the court acted within its discretion in admitting them for the jury's critical review.

█ Although we affirm the admission of the letters under Rule 5–901(b)(4), we do not approve of the maneuver. The State was entitled to obtain a handwriting exemplar from Gerald before trial. *Gilbert v. State,* 388 U.S. 263, 267–68, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). An exemplar would have given the court a firmer basis to rule on the letters' admissibility and would have allowed the jury to better weigh the letters' impact. We see no justification in the record for why the State failed to obtain an exemplar, which clearly could have been a stronger ground for admission of the evidence in this case.

## II.

In the second point of error, Gerald contends that the circuit court admitted hearsay testimony. He refers to the following part of Everhart's direct examination:

Q. [PROSECUTOR]: Now, when you received the first letter from Mr. Gerald, threatening your family, how did you feel?

A. [EVERHART]: Mad and upset.

Q. When you received the Affidavit from Mr. Gerald, how did you feel?

A. Confused.

Q. Why were you confused?

A. Because in the beginning I was going to fill in those blanks, but, while I was detained I had a cell buddy, and he explained it to me [that] Ronald Gerald being locked up the maximum of times, he knows what he is doing . . .

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

A. [EVERHART]: He knows what he's doing and he's trying to use me because it was recently my first time of really being locked up for a situation like this.

In Gerald's view, Everhart conveyed an unidentified prisoner's extrajudicial assertions as to Gerald's character and criminal history. The State retorts that the cell mate's statements were not admitted for their truth, but to explain Everhart's decision not to sign the affidavit.

The trial court is afforded great deference in its admission of evidence. *Ware v. State*, 360 Md. 650, 672, 759 A.2d 764 (2000). "Once a finding of relevancy has been made, we are generally loath to reverse a trial court unless the evidence is plainly inadmissible under a specific rule or principle of law or there is a clear showing of an abuse of discretion." *Merzbacher v. State*, 346 Md. 391, 404–405, 697 A.2d 432 (1997). Here, Everhart's explanation for why he chose not to sign the affidavit was relevant to the jury's evaluation of his credibility. *See* Md. Rule 5–401 (2000). Everhart's cell

mate convinced him that Gerald was an experienced criminal, who would readily sacrifice Everhart's well-being for his own. Learning of that revelation, a juror might better appreciate why Everhart was willing to testify for the State, even though Gerald had threatened retaliation.

■ Insofar as the testimony could have prejudiced Gerald because it referred to his penal history, the potential for harm was minimal. *See Ware,* 360 Md. at 673, 759 A.2d 764. Gerald was charged with possession of a firearm by a convicted felon. Rather than have the State admit true test copies of Gerald's prior convictions, the parties stipulated that "the Defendant at the time of this incident ... was, in fact, a convicted felon." The court acted within its discretion in allowing Everhart to repeat a stipulated fact in the course of explaining his reason for cooperating with the State.

## III.

■ Gerald next challenges the sufficiency of the evidence for the convictions of use of a handgun in the commission of a felony or crime of violence and possession of a firearm by a convicted felon. He claims that the record fails to support a finding that the weapon he used met the statutory size requirements for a handgun, as enumerated in the Maryland Code (1996 Repl.Vol., 2000 Supp.) Art. 27, § 36F(e) and (f). The standard for our review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Sowell,* 353 Md. 713, 726, 728 A.2d 712 (1999) (citations omitted).

> Fundamentally, our concern is not with whether the trial court's verdict is in accord with what appears to us to be the weight of the evidence, but rather is only with whether the verdicts were supported with sufficient evidence—that is, evidence that either showed directly, or circumstantially, or supported a rational inference of facts which could fairly

convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt.

*State v. Albrecht,* 336 Md. 475, 478–79, 649 A.2d 336 (1994) (citations omitted).

■ To meet the size requirements, the State needed to prove that the gun was either a short-barreled shotgun, measuring less than 26 inches long with a barrel less than 18 inches, or a short-barreled rifle, measuring less than 26 inches with a barrel less than 16 inches. Art. 27, § 36F(e) and (f). Both Everhart and Cornish testified that Gerald withdrew a sawed-off gun from a backpack, and both of them demonstrated the length of the gun with their hands. When Everhart held up his hands, the prosecutor estimated the distance between them to be 18 inches to two feet. Defense counsel objected that the length was more like two-and-a-half to three feet, disqualifying the gun under § 36F. The court responded, "The jury has seen it." When Everhart then estimated the length of the gun's barrel using his hands, the prosecutor remarked that the distance was a little more than a foot. Again, defense counsel objected, measuring the distance as approximately two feet, and, again, the court ruled that the jurors saw the demonstration for themselves. Cornish's demonstrations were not accompanied by a verbal description for the record.

In our review of Maryland law, we discovered more than a handful of reported cases in which the accused challenged the sufficiency of the evidence for a weapon conviction.[2] We did

---

2. For examples of weapon convictions overturned for insufficient evidence, see *Stanley v. State,* 118 Md.App. 45, 57, 701 A.2d 1174 (1997)("State presented no evidence to demonstrate the type of knife used."), *aff'd in part, vacated in part on other grounds,* 351 Md. 733, 720 A.2d 323 (1998); *Washington v. State,* 293 Md. 465, 475, 445 A.2d 684 (1982) (knife described as a "long silver knife" and a "sharp pointed object."); *Pharr v. State,* 36 Md.App. 615, 632, 375 A.2d 1129 (1977) (gun not admitted into evidence, the victim described the weapon as a "silver handgun" and the assailant confessed to using a "silver blank gun."); *Tisdale v. State,* 30 Md.App. 334, 345, 353 A.2d 653 (1976) (gun introduced into evidence, and an officer testified that the weapon was a

not find any case, however, with facts directly on point to this case, where the State attempted to prove the size of a gun exclusively by its witnesses' physical demonstrations. Perhaps the most similar case is *Beard v. State*, 47 Md.App. 410, 423 A.2d 275 (1980), where the defendant was charged, among other crimes, with use of a handgun in commission of a felony and unlawfully carrying a handgun. As here, the type of gun used in the crime was at issue. A witness testified that she looked in a bag that belonged to the defendant and saw blood-stained clothing, "a gun and some bullets inside the cloth." *Id.* at 412, 423 A.2d 275. Questioned by the court, the witness explained that she was not familiar with guns and could not distinguish a revolver from a pistol. She described the gun as "old, big, brown, and rusty." *Id.* at 412–13, 423 A.2d 275. Defense counsel then questioned the witness as to the size of the gun by asking whether it was bigger than another gun left in the witness's apartment. *Id.* at 413, 423 A.2d 275. The witness answered that the defendant's gun was indeed bigger, but she could not identify by name the gun left in her apartment. *Id.* Thus, the witness sized the gun based on another gun, but the comparison failed because the witness could not identify the second gun, the standard for the comparison.

Following *Beard*, we decided *Manigault v. State*, 61 Md. App. 271, 286–87, 486 A.2d 240 (1985), where the defendant was charged with unlawful possession of a handgun. To prove that the weapon was indeed a handgun, the State presented the testimony of two victims, who described the gun as a big, black, metal handgun. One of the victims also testified that the defendant's hand covered most of the gun during the

---

.22 caliber gas pistol), *aff'd on other grounds*, 41 Md.App. 149, 396 A.2d 289 (1979).

Weapon convictions were affirmed as supported by sufficient evidence in *Woods v. State*, 315 Md. 591, 623, 556 A.2d 236 (1989), where the State admitted an FBI report that linked the gun found at defendant's house to the bullets found in the victim's body, and *Hall v. State*, 57 Md.App. 1, 15, 468 A.2d 1015 (1983), where the knife was introduced into evidence.

shooting. That testimony, the Court reasoned, distinguished Manigualt's case from Beard's because it "permit[ted] a reasonable inference that it was a handgun and not a full-fledged rifle or shotgun." *Id.* at 287, 486 A.2d 240. Thus, the State sufficiently sized the gun by comparing it to an adult male's hand.

In Gerald's case, the witnesses sized the gun by demonstrating a distance between their hands, but we have no objective description of those demonstrations. Clearly, this is not the proper way to prove a precise element of a crime, which is measured in inches and feet. We are also mindful that the jury, sitting at a distance from the witness stand, would have had difficulty skillfully judging the advocates' competing interpretations of the hand demonstrations. Nonetheless, based on the record before us, and the deferential standard of review, we cannot say that the evidence for the firearm convictions was insufficient.

## IV.

The indictment in this case set forth fourteen counts in the following order: (1) attempted first degree murder; (2) attempted second degree murder; (3) first degree assault; (4) second degree assault; (5) reckless endangerment; (6) use of a handgun in commission of a felony or crime of violence; (7) unlawful wear, carry, and transport of a handgun; (8) conspiracy to commit robbery; (9) robbery with a dangerous weapon; (10) theft greater than $300.00; (11) theft less than $300.00; and three counts of possession of a firearm as a convicted felon.

Gerald contends that the first degree assault conviction was a lesser included offense of the robbery conviction, and accordingly, the twenty-five-year sentence for assault merges into the twenty-year sentence for robbery. That reasoning, in the State's view, nullifies the purposeful drafting of the indictment to separate the act of attempting to murder Cornish from the act of robbing him. In its view, the assault counts were placed under the attempted murder counts on the indictment

to show that all four counts related to the act of firing the weapon at Cornish. As the State argued at sentencing:

If the Court recalls the facts in this case, the Defendant, upon confronting the victim, hit the victim in the middle of his forehead with the butt of a shotgun which forced the victim to the his knees and his hands. He was on all fours bleeding down his face when the Defendant then reached in the victim's pocket and took U.S. currency. After he took the U.S. currency, the State's contention is that at that point the robbery is done and at that point the Defendant took the shotgun and shot the victim in the back which was the attempted murder. . . .

The court accepted the State's theory, explaining:

I agree that the charging document made clear to the Defendant that that was the theory upon which the State was proceeding and it would be my conclusion that the reason the later event preceded the earlier event in sequence on the charging document is because the later event was deemed by the State at the time of charging to be the more serious.

 Gerald reminds us that any ambiguity in the indictment or as to how the jury understood the charges must be resolved in his favor. *Snowden v. State,* 321 Md. 612, 618–19, 583 A.2d 1056 (1991). As cogent as the State's theory may be on appeal, it is not at all clear that the jury considered the evidence in accordance with that theory. The court instructed the jury on the elements of each charge, but it did not explain how the assault and robbery charges related to one another, how they differed, and what the jury needed to find to convict under both charges. *See Graham v. State,* 117 Md.App. 280, 289, 699 A.2d 1204 (1997)(no ambiguity where the court clearly explained the difference between the two counts at issue); *Cortez v. State,* 104 Md.App. 358, 369, 656 A.2d 360 (1995) (advising courts on how to instruct juries to avoid merger problems). With an ambiguity in the indictment, and non-curative instructions, the first degree assault conviction must indeed merge into the robbery conviction.

■ Notwithstanding the merger, the mandatory sentence of twenty-five years' incarceration without the possibility of parole stands, albeit for the robbery instead of the assault. *See State v. Taylor,* 329 Md. 671, 676, 621 A.2d 424 (1993). The prosecution properly served notice that it intended to seek a sentence under Maryland Code (1996 Repl.Vol., 2000 Supp.) Article 27, § 643B, and at sentencing, it proffered that Gerald had previously been convicted of robbery with a dangerous weapon in 1994 and attempted second degree murder in 1995. Section 643B required the court to impose a twenty-five-year minimum sentence given the predicate offenses. *See Taylor,* 329 Md. at 675, 621 A.2d 424 (quoting *Loveday v. State,* 296 Md. 226, 236–37, 462 A.2d 58 (1983)). Although under *Calhoun v. State,* 46 Md.App. 478, 488–90, 418 A.2d 1241 (1980), *aff'd,* 290 Md. 1, 425 A.2d 1361 (1981), the court could not impose the mandatory sentence for both the first degree assault and the robbery, under *Jones v. State,* 336 Md. 255, 265, 647 A.2d 1204 (1994), it had discretion to attach the sentence to either offense. Where, as here, the court mistakenly employed its discretion to attach the § 643B sentence to the lesser included offense, we vacate the sentences for both convictions and direct the court to attach the minimum twenty-five-year sentence to the surviving conviction. *Taylor,* 329 Md. at 676, 621 A.2d 424.

**SENTENCE FOR FIRST DEGREE ASSAULT AND ROBBERY WITH DANGEROUS WEAPON VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR IMPOSITION OF A NEW SENTENCE IN ACCORDANCE WITH THIS OPINION. JUDGMENTS OTHERWISE AFFIRMED.**

**COSTS TO BE DIVIDED EQUALLY BETWEEN APPELLANT AND MAYOR AND CITY COUNCIL OF BALTIMORE.**