REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2110

September Term, 2014

_____

JOHNNIE ARMSTEAD RILEY

v.

STATE OF MARYLAND

_____

Eyler, Deborah S.,
Wright,
Friedman,

JJ.

_____

Opinion by Wright, J.

_____

Filed: March 30, 2016

On June 10, 2014, Sergeant Johnnie Armstead Riley, appellant, was convicted of first-degree and second-degree assault, use of a handgun in the commission of a crime of violence, and misconduct in office by a jury in the Circuit Court for Prince George's County. On November 13, 2014, the court sentenced Sgt. Riley to twenty years in prison with all suspended except for five years to be served without the possibility of parole, for use of a handgun during the commission of a crime of violence; a concurrent twenty-year sentence, with all but three years suspended, for assault in the first degree;[1] and to a concurrent three years in prison for misconduct in office. The court also placed Sgt. Riley on five years of supervised probation. On November 17, 2014, Sgt. Riley noted this appeal, presenting a single question for review:

Was the evidence insufficient to sustain the appellant's convictions?

**Facts**

This case stems from an on-duty police shooting. On September 6, 2012, shortly after 5:17 p.m., twenty-five year old Calvin[2] Kyle ("Kyle") was riding a stolen motorcycle on Marlboro Pike in the District Heights municipality of Prince George's County. Kyle's friends were driving ahead of him in a gold Chevrolet Tahoe (the "SUV") on the way to a repair shop to swap a flat tire on the motorcycle. Sgt. Riley was on patrol in an unmarked Ford Crown Victoria when the SUV and the motorcycle made illegal left turns onto Scott Key Drive before splitting up and going different ways. The

---

[1] The second-degree assault count merged for the purpose of sentencing.

[2] The record refers to an incorrect spelling of Calvin's first name with a "K." The correct spelling is with a "C."

SUV continued straight onto Scott Key Drive and the motorcycle turned onto Foster Street and traveled the wrong way down the one-way street.

After observing the traffic violations, Sgt. Riley activated his emergency lights and began a pursuit of the motorcycle. Kyle, the motorcyclist, did not stop when he saw Sgt. Riley behind him and instead attempted to merge onto County Road but was impeded by heavy traffic. After pulling Kyle over, Sgt. Riley approached him and informed him that he had been riding the wrong way down a one-way street. When asked for his name, Kyle, who had no license, identified himself as "Kalvin Paterson." A license check revealed no records for a "Kalvin Paterson." Kyle did not comply with Sgt. Riley's requests to shut off the motorcycle and dismount. When Sgt. Riley heard a change in the engine, he believed that Kyle was "getting ready to run." Sgt. Riley then lowered the kickstand and took Kyle off of the motorcycle.

After police dispatch informed Sgt. Riley that the motorcycle had been reported as stolen, Sgt. Riley advised Kyle that he was under arrest. Sgt. Riley searched Kyle's pockets, handcuffed him, and sat him on a curb. Sgt. Riley removed Kyle's shoes, hoping to find some form of identification but found none. Sgt. Riley then placed Kyle in the front passenger seat of his police vehicle for transport to the jail, securing him with a seat belt, before locking the door. By then, Officer Douglas McMillan had arrived as backup, but Sgt. Riley told him to return to service after hearing dispatch calls for Ofc. McMillan over the radio.

Kyle's phone rang seven times while he waited with Sgt. Riley in the police vehicle for a tow truck to pick up the motorcycle. When asked by Sgt. Riley if he was

with the SUV, Kyle said "no." At one point, while waiting in the car, Kyle uttered, "there's the gold Tahoe." When Sgt. Riley looked up, he saw the SUV making a right turn from Foster Street onto Blazer Drive. Sgt. Riley then "started packing up everything" and walked to County Road to photograph the motorcycle in order to document the missing ignition. At that time, the SUV traveled towards Sgt. Riley at 10-15 miles per hour with the driver staring at the cruiser and hanging his arm and torso outside of the vehicle.

Sgt. Riley realized that Kyle had taken off and spotted him running on Foster Street towards Scott Key Drive. Sgt. Riley began a pursuit on foot. Sgt. Riley lost sight of the SUV and assumed that it had turned onto Elmhurst Street, which intersects with Scott Key Drive. Sgt. Riley then tried to get on the radio to request additional units, but the radio was "tied up" with other dispatch calls. During his foot chase with Kyle, Sgt. Riley's expandable baton became fully extended and restricted his running. In "an act of desperation," Sgt. Riley threw the baton at Kyle, adding that "everything became intense" at that point. Sgt. Riley said he believed that the SUV was there to pick up Kyle, stating:

> At that point I started formulating that he's going to make it around the corner; we're going to be exposed. Then I'm fearing for myself, because I know once I turn that corner with Mr. Kyle, that I might be hurt. I might be put into a possible ambush. I'm not just dealing with Mr. Kyle on foot; now I got to deal with the two suspects in the car - - the two unknown people in the truck, and I got to deal with the truck itself as a weapon.

Sgt. Riley yelled four times, "stop or I'll shoot," before firing two shots as he ran. One of the shots hit a parked vehicle. Sgt. Riley then stopped and turned, and fired a

3

third shot hitting Kyle. According to Sgt. Riley, five or six seconds passed from when he saw Kyle running to when he fired his weapon.

Sgt. Riley testified that when he walked up to Kyle following the shooting, he "was surprised [to see] that Mr. Kyle was still cuffed." Sgt. Riley immediately reported the shooting to the dispatcher saying, "shots fired, shots fired. County Road and Foster. Suspect down. I shot my suspect." Officer Joseph Angle, who had just cleared a robbery a mile away, and Wendell Brantley, a Deputy Chief of Police for the District Heights Police Department, both responded to the scene, where they saw Sgt. Riley administering aid to Kyle. As a result of being shot, Kyle's spine was severed, leaving him paralyzed from the waist down.

State's witnesses, Adena Davis, Andrea Brown, and Latoya Cannon, said that they saw an officer chasing an individual who was running. Brown said that she saw the individual escape from the officer's vehicle as the officer photographed the motorcycle, while Davis stated that the individual "kept looking back" at the officer. Both Brown and Davis testified to seeing the officer throw his baton at the individual, and they estimated that the officer was 25-30 feet from the individual when he fired his weapon.

The State presented two experts on the use of force by police. Sergeant William Gleason, a member of the Prince George's County Police Department, testified that he did not believe that Sgt. Riley used a reasonable use of force. Specifically, Sgt. Gleason noted that Kyle was running away from Sgt. Riley for a relatively unserious offense while restrained in handcuffs behind his back. As such, Kyle did not pose any imminent

4

threat of harm because "no reasonable person would believe that [Kyle] was armed at the time," particularly since Sgt. Riley had already searched Kyle's person twice.

Craig Dickerson, a thirty-year veteran of the Montgomery County Police Department, testified and based on the information presented, he believed it was a "tactical error in judgment." According to Dickerson, an officer is permitted to use deadly force "based on the threat and . . . the seriousness of the crime," but that Kyle posed a minimal threat as he was handcuffed and running away. Dickerson also added that a "better or more reasonable action" would have been to "call and ask for assistance."

The defense presented its own expert on the use of force. David G. Bolgiano, a retired military officer,[3] testified that because the officers confront tense and rapidly evolving situations, the deadly force policy is "deliberately vague" and not subject to "bright-line rules." Bolgiano testified that "inattentional blindness" and loss of fine motor skills caused by the fear of death impacted Sgt. Riley's actions. According to Bolgiano, "viewed from the perspective of a reasonable police officer and the information that officer possessed at the time he made the decision to use deadly force

---

[3] Bolgiano has participated in crafting the "use of force" policies for the Drug Enforcement Administration, the Department of Justice, the United States Air Security Forces, the United States Special Operations Command Central, the U.S. Army, and the Center for Law and Military Operations.

and all the pre-assaultive indicators[4] that were present, his actions were objectively reasonable."

After deliberating for eight hours, the jury acquitted Sgt. Riley of attempted murder in the second degree, but convicted him of assault in the first and second degree, use of a handgun during the commission of a crime of violence, and misconduct in office. This appeal followed.

Additional facts will be included below as they become relevant to our discussion.

**Standard of Review**

On a claim that the evidence is insufficient to support the conviction, the standard of review is whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Gerald v. State*, 137 Md. App. 295, 308 (2001) (citation omitted). "Our concern is not with whether the trial court's verdict is in accord with what appears to us to be the weight of the evidence, but rather is only with whether the verdicts were supported with sufficient evidence – that is, evidence that either showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt."

---

[4] Bolgiano classified the following as pre-assaultive danger cues: Kyle's apparent collusion with other subjects; his attempt to evade Sgt. Riley by going down the one-way street; his possession of a stolen motorcycle; his noncompliance with commands; his giving of a false identity; his cell phone repeatedly ringing; his co-conspirator circling the block in an SUV; his escape; his continued flight after Sgt. Riley threw his baton and gave verbal warnings; his turning to look over his shoulder; and his bent elbow as he ran, "showing reaching for a potential weapon."

6

*State v. Albrecht*, 336 Md. 475, 478-79 (1994) (internal citations omitted). In that regard, we defer to the fact finder's "resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses." *State v. Suddith*, 379 Md. 425, 430 (2004) (citation omitted). Thus, "the judgment of the trial court will not be set aside on the evidence unless clearly erroneous." *State v. Manion*, 442 Md. 419, 431 (2015) (citation omitted).

## Discussion

### I. Assault

Sgt. Riley first argues that the evidence was insufficient to sustain his conviction for assault. Specifically, Sgt. Riley contends that "[b]ecause there was no evidence presented to support a finding that [he] acted with malice in using his service weapon, the State failed to prove that he was criminally liable under §§ 3-202, 3-203 . . . of the [Md. Code (2002, 2012 Repl. Vol.),] Criminal Law Article [("CL")]." In support of his argument, Sgt. Riley emphasizes that "for criminal liability there must be 'concurrence of an evil-meaning mind with an evil-doing hand.'" (Quoting *Morissette v. United States*, 342 U.S. 246, 251 (1952)).

At the conclusion of the State's case in the circuit court, counsel for Sgt. Riley moved for judgment of acquittal, stating:

> With respect to the assault counts, because of my client's position as a police officer, I still think the State - - because an officer has some degree of immunity for his actions, the State still has to prove that these acts were done with malice.
>
> *   *   *
>
> I've submitted a requested jury instruction on malice that I would call to the Court's attention . . . . I believe I submitted - - that they'd have

7

to show that he acted knowingly and deliberately for an improper motive and without legal justification.

Mere errors of judgment, whether occasioned by negligence o[r] otherwise, are not crimes.

Similarly, an act that is done merely because of mistake, accident, carelessness, or other innocent reason is not done maliciously.

Defense counsel renewed his argument at the conclusion of the entire case, stating in pertinent part:

The State is trying to argue to the Court that a police officer, for actions which the subsequent statute assigns, actions for which he could not be civilly liable for a nickel, he's criminally liable. And I don't think that that is what any case says. I don't think that makes sense.
* * *
The legislature is saying when an officer is acting in the course of his duties, there's a level of governmental immunity that applies, and that would also carry over to the criminal law.

In response, the State argued:

I disagree . . . that the case law in any way has the added burden of the State showing malice on the part of the defendant in the context of a criminal case. I believe that the case law clearly will show, and there are statutes to the effect that affirm this, malice is a required element in the civil context; however, it is not in the criminal context.

Ultimately, the circuit court agreed with the State and denied the motion for judgment of acquittal stating:

I see nothing in the definition of battery . . . or in the definition of assault that talks about malice. I mean, it's very clear.

Battery, if you look at the instruction - - this is the assault count that would lie . . . which is at [Maryland Criminal Pattern Jury Instructions] 4:01(c), "assault is causing offensive physical contact to another person. The State must prove, one, that the defendant caused the physical harm; two, that the contact was the result of an intentional or reckless act and was

8

not accidental; and, three, that the contact was either not consented to or not legally justified." That's not complex. That's the state of the law.

And then to add first degree to it means that it was done causing serious permanent - - and permanent or serious protracted injury and that it was done by a firearm.

Subsequently, the State, in its rebuttal closing argument, contended that even if the jury found no intent to kill, Sgt. Riley was guilty of assault "because he inflicted a very serious sort of physical injury on [C]alvin Kyle that wasn't consented to in any way by Mr. Kyle[.]"

We agree with the State and the circuit court that Sgt. Riley's reliance on *Morissette* is misplaced. The substantive elements of assault do not change based on the identity of the defendant. In this case, Sgt. Riley was convicted of assault, a general intent crime, *Genies v. State*, 196 Md. App. 590, 601 (2010), *aff'd*, 426 Md. 148 (2012), that does not require malice.[5] *Johnson v. State*, 223 Md. App. 128, 147, *cert. denied*, 445 Md. 6 (2015). "Because it lacks the element of malice, [ ] assault cannot be reduced by the defense of provocation into some lesser offense." *Id.* "A provocation defense . . . serves only to mitigate the presence of malice and cannot absolve an individual of all criminal liability." *Id.* at 146 (citations omitted). Nonetheless, as the State correctly notes, Sgt. Riley was "entitled to raise the affirmative defense of law-enforcement justification, which he in fact did" and which, according to the verdict, the jury did not accept. *See generally Tavakoli-Nouri v. State*, 139 Md. App. 716, 731 (2001)

---

[5] Malice may be inferred from (1) an act by the accused sufficient to show an intent to inflict great bodily harm or (2) an act the natural tendency of which would cause death or great bodily harm. *See Lindsay v. State*, 8 Md. App. 100, 107 n.10 (1969).

(recognizing "that police officers, when arresting a suspect, have the right to take reasonably necessary measures to make the arrest in a manner that protects both the public and themselves," including the use of force) (citation omitted); *Wilson v. State*, 87 Md. App. 512, 520 (1991) ("We hold that a police officer, from the perspective of a reasonable police officer, may use only that amount of force reasonably necessary under the circumstances to discharge his duties.") (Citation omitted); *see also* 2 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 10.7 at 173 (West 2d ed. 2003) ("A police officer, or a person aiding him, is justified in using reasonable force to make a lawful arrest or to prevent the escape from custody of one already arrested."); 2 PAUL H. ROBINSON, 2 CRIMINAL LAW DEFENSE § 142 (West 1984, updated July 2015) (discussing the "public authority" forms of "justification defenses" to criminal culpability).

Sgt. Riley cites *Elonis v. United States*, 135 S. Ct. 2001 (2015), and *State v. Pagotto*, 361 Md. 528 (2000), to support his contention, but those cases are inapposite. The portion of *Elonis* that Sgt. Riley relies on instructs that strict-liability crimes are disfavored and, when appropriate, a court will impute a *mens rea* element to avoid them. 135 S. Ct. at 2009. But, battery is not a strict-liability crime. Rather, it requires proof that the offensive physical contact the defendant made with the victim was the result of reckless or criminal negligence. *Elias v. State*, 339 Md. 169, 184 (1995).

Meanwhile, *Pagotto* is factually distinguishable. In that case, Pagotto, a police officer, was charged with involuntary manslaughter and reckless endangerment following an incident in which a bullet from his handgun killed a motorist who was driving a vehicle that Pagotto was attempting to stop while on duty. *Pagotto*, 361 Md. at 534-38.

The Court of Appeals later vacated Pagotto's convictions after concluding that "the evidence presented at trial, as a matter of law, was insufficient" as "Sergeant Pagotto's behavior simply did not evidence a 'wanton or reckless disregard for human life.'" *Id.* at 553. Sgt. Riley, however, provides no argument to indicate why we should apply the elements of involuntary manslaughter or reckless endangerment to a case involving assault. More importantly, we note that unlike in this case, the *Pagotto* Court concluded that "[t]he State produced no evidence that [Sergeant] Pagotto was aiming his gun at [the victim] when it discharged." *Id.* at 554.

Here, a rational trier of fact could have found that: (1) Sgt. Riley caused Kyle physical harm; (2) the contact was the result of an intentional or reckless act and was not accidental; and (3) the contact was not consented to by Kyle. Thus, there was sufficient evidence to support Sgt. Riley's conviction for assault.

## II.    Use of a Handgun

Next, Sgt. Riley argues that the evidence was insufficient to sustain his conviction for use of a handgun during the commission of a crime of violence pursuant to CL § 4-204. In pertinent part, this section states: "A person may not use a firearm in the commission of a crime of violence, as defined in § 5-101 of the [Md. Code (2003, 2011 Repl. Vol.),] Public Safety Article [("PS")], or any felony, whether the firearm is operable or inoperable at the time of the crime." CL § 4-204(b). According to Sgt. Riley, "§ 4-204 is not intended to deter a police officer who is required to carry a firearm and [who is] permitted to use [it] in the course of carrying out his duties."

11

In response, the State contends that Sgt. Riley did not preserve this issue for our review because he never argued it below. Alternatively, the State asserts that Sgt. Riley's argument fails on the merits because: (1) the Legislature did not intend to limit CL § 4-204 to a "preexisting subset of citizens against whom the statute would operate[;]" (2) Sgt. Riley's construction of the statute is dependent upon his view that he "act[ed] in accord with his sworn duty to enforce the State's criminal laws when he used his service weapon," which is inconsistent with the jury's factual findings; and (3) his interpretation of CL § 4-204 "would lead to an absurd result . . . [as] any person with a clean record could violate the statute with impunity because that person would not be a criminal yet."

Assuming without deciding that Sgt. Riley preserved this issue for our review, we agree with the State that his argument nonetheless has no merit. "In construing a statute, one begins with the 'plain meaning' of the statutory language and may end there if the meaning is plain enough." *State v. Roshchin*, No. 10, Sept. Term, 2015, slip op. at 11 (Md. Jan. 26, 2016) (footnote omitted). A plain reading of the relevant portion of CL § 4-204 prohibits a person from using a firearm in the commission of a crime of violence. CL § 4-204(b).[6] In turn, PS § 5-101(c)(3) includes second-degree assault as a crime of violence. Had the Legislature intended to exempt police officers from the prohibition imposed by CL § 4-204, it could have specified as such. *Cf.* CL § 4-203(b)(1)

---

[6] Because CL § 4-204 is plain enough, we need not address Sgt. Riley's reasoning rooted in CL § 4-202 (legislative findings), PS § 3-201 (defining "police officer"), Md. Code (2001, 2008 Repl. Vol.), § 2-101 of the Criminal Procedure Article (same), and COMAR 12.04.01.12(B)(1) (listing "Annual Police Officer Firearms Training and Qualification Requirements").

(specifically creating an exception for police officers with regard to the crime of wearing, carrying, or transporting a handgun); 18 U.S.C. § 926B (same). Here, it is undisputed that Sgt. Riley is a person who used his service weapon to shoot Kyle, and he resultantly, was found guilty of second-degree assault. Thus, there was sufficient evidence to support Sgt. Riley's conviction for use of a handgun during the commission of a crime of violence under CL § 4-204.

Sgt. Riley cites *State v. White*, 29 N.E.3d 939, 949-50 (Ohio 2015), *cert. denied*, 136 S. Ct. 73 (2015), but his reliance on that case is misplaced. Although Sgt. Riley correctly recognizes the Supreme Court of Ohio's statement that "it is neither just nor reasonable to apply a firearm specification to a police officer involved in an on-duty shooting based only on a showing of poor judgment or negligence in using force," he fails to acknowledge the following clarification made by the Court:

> [T]he statute requires that a distinction be drawn between a police officer who acts in accord with the duty to uphold the law and one who abandons that duty by committing a criminal offense.
>
> The firearm specification may apply if the facts of a given case demonstrate that the actions of the officer display criminal misconduct constituting a departure from the course and scope of official duties, as police officers have no license to commit crimes under color of office. *See, e.g.*, *United States v. Ramos*, 537 F.3d [439,] 458 [(5th Cir. 2008)] (upholding application of a firearm specification to border patrol officers convicted of criminal offenses for **shooting a fleeing suspect when there was no physical threat to the officers or to others**); *United States v. Moore*, 363 F.3d 631, 641 (7th Cir. 2004) (upholding application of a firearm specification to police officers "hired to use their status as police officers, with all the trappings, to protect Silky's drug couriers," even though the officers' service weapons had not been brandished or used); *United States v. Contreras*, 950 F.2d 232, 241-242 (5th Cir. 1991) (upholding application of a firearm specification to a police officer who conducted a traffic stop and then sexually assaulted a passenger in the vehicle).

*Id.* at 949 (emphasis added). Where, as here, there was testimony that Sgt. Riley shot Kyle as Kyle was handcuffed and running away, and therefore, did not pose any imminent threat of harm, we hold that CL § 4-204 applied. *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable . . . . Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.").

## III. Misconduct in Office

Finally, Sgt. Riley challenges his conviction for misconduct in office, arguing that "mere errors in judgment did not come within the conduct proscribed by this offense." In support of his argument, Sgt. Riley cites *Leopold v. State*, 216 Md. App. 586, 604-05 (2014), where we stated:

> "In Maryland, misconduct in office is a common law misdemeanor." *Duncan v. State*, 282 Md. 385, 387, 384 A.2d 456 (1978) (footnote omitted). It has been defined as "corrupt behavior by a public officer in the exercise of the duties of his office or while acting under color of his office." *Id.* (citing PERKINS ON CRIMINAL LAW 485 (2d ed.1969); *Hitzelberger v. State*, 174 Md. 152, 197 A. 605 (1938)). The corrupt behavior may be: (1) the doing of an act which is wrongful in itself, or "malfeasance;" (2) the doing of an act otherwise lawful in a wrongful manner, or "misfeasance;" or (3) the omitting to do an act which is required by the duties of the office, or "nonfeasance." *Id.* (citations omitted). Acts that qualify as misconduct in office include:

> > neglect or non-performance of any positive duty imposed by law; *oppressive and wil[l]ful abuse of authority* (**to be distinguished from mere error of judgment**); extortion; fraud or breach of trust affecting the public, such as rendering, passing or procuring false accounts, or wil[l]fully neglecting to account for money received, or corruptly

14

> retaining money found upon a prisoner; grossly indecorous conduct, such as sitting as a justice while drunk, or getting drunk during time of service as a grand juror.

> *Chester [v. State]*, 32 Md. App. [593,] 606, 363 A.2d 605 [(1976)] (citation omitted and emphasis added).

(Italicized emphasis in original; bolded emphasis added). According to Sgt. Riley, because "the State's experts plainly opined that appellant's act of shooting Kyle was 'a tactical error in judgment,'" then the evidence does not support the State's contention that Sgt. Riley "'willfully disregarded' the standard for using deadly force."

We reiterate that, in reviewing a claim for insufficiency of evidence, the standard of review is whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Gerald*, 137 Md. App. at 308 (citation omitted). The flaw in Sgt. Riley's argument on appeal is that he focuses on the portion of the State's experts' testimonies wherein Sgt. Gleason and Dickerson opined that Sgt. Riley made an "error in judgment." Sgt. Riley, however, disregards the portion where both experts stated that he acted unreasonably. For example, Sgt. Gleason went on to testify that Sgt. Riley "used unnecessary force and unreasonable force[,]" while Dickerson stated that "no reasonable person is going to use deadly force in this incident with [the victim's hands] handcuffed behind his back." Viewing this evidence in the light most favorable to the State, the jury

15

could have found – and did, in fact, find – that Sgt. Riley exercised a willful abuse of his

authority and not simply a mere error in judgment.[7]

Thus, for all of the foregoing reasons, we affirm the circuit court's judgments.

**JUDGMENTS OF THE CIRCUIT COURT FOR
PRINCE GEORGE'S COUNTY AFFIRMED.
COSTS TO BE PAID BY APPELLANT.**

---

[7] Although not from this jurisdiction, *State v. Lore*, 484 A.2d 1259 (N.J. App. Div. 1984), is instructive. In that case, an on-duty police officer fired a shot at an individual whom he was attempting to arrest, while the individual was fleeing. *Id.* at 1261. In affirming the officer's convictions for simple assault and misconduct in office, the Superior Court of New Jersey stated:

> It is undisputed that defendant came upon the scene of a fight or scuffle and attempted to arrest Molowitz. The duties of a public servant, such as a police officer, are those which are cast by law upon that public servant or those which are inherent in and naturally arise from the nature of the office. It is also clear that a police officer has the responsibility of investigating and arresting suspected violators of the law. He is permitted, however, to use only such force as may be reasonably necessary to effectuate the arrest. We, therefore, have no doubt that defendant was engaged in an official function of his office as a police officer when he arrested Molowitz. The jury found that in the course of effectuating that arrest, defendant used excessive force injuring Molowitz which constituted a simple assault upon Molowitz. The assault therefore became "an act relating to his office" which was committed "with purpose . . . to injure" Molowitz and that assault constituted "an unauthorized exercise of his official functions." The use of excessive force while arresting Molowitz also means that defendant performed an official function in "an unauthorized manner."

*Id.* at 1262 (citations omitted). Comparably, in the case before us, the jury found Sgt. Riley guilty of second-degree assault. Thus, the assault became an act "by a public officer in the exercise of the duties of his office" which was "corrupt," and that assault constituted an "oppressive and willful abuse of authority." *See Leopold*, 216 Md. App. at 604-05.