## IN RE: DAVID K.

[No. 1287, September Term, 1980.]

*Decided May 13, 1981.*

*Neil Edward Axel* for appellant.

*Patricia E. McDonald, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Eric E. Wright, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

The seventeen-year old appellant was found to be a delinquent child by reason of his having committed certain traffic offenses. He makes no complaint about that finding. What he does complain of is the dispositional order entered by the court. Specifically, he asks in this appeal whether the juvenile court had the authority to (1) require him to pay a $500 fine, and (2) suspend his driving privileges for an indefinite period.

The relevant facts are not in dispute. We shall adopt the statement of them set forth in appellant's brief:

"On May 24, 1980, at approximately 4:00 p.m., Maryland State Police Trooper S. A. McGee was operating a stationary radar speed gun at U.S. Route 50 and Bell Road in Worcester County. At the time, a 1966 Buick automobile, operated by the Appellant, was observed in the fast lane of eastbound U.S. Route 50 at a high rate of speed. The radar speed gun indicated the vehicle was traveling at 101 miles per hour in the 55 mile per hour speed zone at that location. The vehicle was in the fast lane and no other motor vehicles were near it. The vehicle was stopped at U.S. Route 50 east of Maryland Route 610, and at that time the police officer could detect a moderate to strong odor of alcohol on the operator. The Appellant's manner was that of an intoxicated person in the opinion of the officer, in that his face was flushed and he staggered when attempting to walk. Also in the motor vehicle operated by the Appellant was a passenger who also smelled of the odor of alcohol. In plain view in the rear seat of the motor vehicle were

ten 16 ounce Colt 45 Malt Liquor cans which were
unopened. The beer was in an ice-filled cooler with
no top. A blood sample was obtained from the
Appellant which was tested for the presence of alco-
hol. The said sample was found to contain 0.15%
ethel [sic] alcohol by weight."

As the result of this occurrence, a juvenile petition was
filed in the Circuit Court for Worcester County charging
appellant with being delinquent by (1) possessing an alco-
holic beverage, in violation of Md. Ann. Code art. 27, § 406
A, (2) operating a motor vehicle while intoxicated, in viola-
tion of Transportation Article, § 21-902 (a), (3) driving while
impaired by consumption of alcohol, in violation of Trans-
portation Article, § 21-902 (b), and (4) speeding, in violation
of Transportation Article, § 21-801.1. At or before the
adjudicatory hearing, the State dismissed charges (1) and
(3), but, proceeding on an agreed statement of facts, the court
found charges (2) and (4) to be sustained and, accordingly,
entered a finding of delinquency.

Pursuant to Courts article, § 3-809, and apparently
without objection, the proceeding was then transferred for
purposes of disposition to Montgomery County, where appel-
lant and his family lived. After holding a disposition
hearing, the District Court for that county, Juvenile Divi-
sion, entered an order: (1) committing appellant to the
Maryland Training School; (2) suspending that commitment
and placing appellant in the care of his parents under a
program of probation to be provided by the Juvenile Services
Administration; (3) directing that appellant receive "a tour"
of the Maryland Training School and referring him to "the
DWI School"; (4) suspending appellant's privilege to operate
a motor vehicle; (5) fining appellant $500, to be paid at the
rate of $100 a month; and (6) continuing the court's jurisdic-
tion over appellant.

In the Stipulation of Facts entered by the parties, we are
told that appellant objected to parts (4) and (5) of the order
— the suspension of driving privileges and the fine. It does
not appear in the stipulation, although it does in the record,

that the court had before it a "social history" indicating that appellant had previously been charged with vandalism, which charge had been informally adjusted based upon an agreement to pay restitution of $1,400, that he had two previous speeding violations, that he consumes a six-pack of beer twice a week (and has been drinking beer since the ninth grade), that he occasionally uses marijuana, and that, in the social worker's view, he did not seem to be taking this episode very seriously.

Appellant's attack on the suspension of his driving privileges and the fine is based on overlapping, yet distinct theories.

By way of introduction, he correctly states that the primal focus of the juvenile causes act is rehabilitation and not punishment. This is clear from § 3-802 of the Courts Article, in which the Legislature·set forth the purposes of the juvenile law, from § 3-824, which states that an adjudication of delinquency is not a "criminal conviction for any purpose and does not impose any of the civil disabilities ordinarily imposed by a criminal conviction," from most of the other operative provisions in that law, and from the interpretations given to the law by the appellate courts of this State. *See, for example, In re Hamill,* 10 Md. App. 586 (1970); *Matter of Davis,* 17 Md. App. 98 (1973); *In re Appeal Misc. No. 32,* 29 Md. App. 701 (1976). The clearest expression of this is Judge Orth's statement in *Davis, supra,* 17 Md. App. at 104:

> "The *raison d'etre* of the Juvenile Causes Act is that a child does not commit a crime when he commits a delinquent act and therefore is not a criminal. He is not to be punished but afforded supervision and treatment to be made aware of what is right and what is wrong so as to be amenable to the criminal laws."

In accord with this philosophy is Courts Article, § 3-820, which lays out the dispositional options available to a juvenile court following a finding of delinquency. Section 3-820 (b) provides:

"The overriding consideration in making a disposition is a program of treatment, training, and rehabilitation best suited to the physical, mental, and moral welfare of the child consistent with the public interest.[1] The court may:

(1) Place the child on probation or under supervision in his own home or in the custody or under the guardianship of a relative or other fit person, upon terms the court deems appropriate;

(2) Commit the child to the custody or under the guardianship of the Juvenile Services Administration, a local department of social services, the Department of Health and Mental Hygiene, or a public or licensed private agency; or

(3) Order the child, parents, guardian, or custodian of the child to participate in rehabilitative services that are in the best interest of the child and the family."

It is important, also, at the outset, to make clear what the court did. As we have noted, it committed appellant to the training school and then suspended that commitment in lieu of a program of probation to be provided by the Juvenile Services Administration. The succeeding obligations imposed upon appellant by the rest of the order were not expressed as conditions to the probation, but rather as independent requirements.[2]

---

1. Senate Bill 62, enacted by the 1981 General Assembly, and currently pending action by the Governor, amends § 3-820 (b) by adding "the public safety" as a co-equal priority in disposition. It rewords the introductory sentence to read, "The priorities in making a disposition are the public safety and a program of treatment. . . ." If signed by the Governor, the bill will take effect July 1, 1981.

2. We note this simply as a fact and not to suggest that, if stated as a condition of probation, these impositions would necessarily be viewed any differently. *See, for example, State v. Rugon,* 355 So. 2d 876, 878 (La. 1977): "Formulating the sentence so as to make the exaction a condition of probation does not change its essential nature nor bar its classification as a fine." *Compare People v. Labarbera,* 201 P.2d 584 (Cal. App. 1949); *Shore v. Edmisten,* 227 S.E.2d 553 (N.C. 1976); and *Brown v. State,* 559 P.2d 107 (Alaska 1977).

(1) *Power to Fine*

The penultimate paragraph, at issue here, said:

"ORDERED that the minor child . . . be fined by the Court the sum of $500.00, said sum is payable in payments of $100.00 per month with the first payment due on or before the 30th day of September, 1980, and subsequent monthly payments due each and every month thereafter until the amount has been paid in full and satisfied. . . ."

That, without question, is a *fine* — not an order of restitution to an injured party (*see* Courts Article, § 3-829) but a fine payable to the State; and it is clear to us that it was beyond the power of the court to impose.

A fine is a penal exaction; it may be imposed only "if there is a 'conviction' which necessarily requires a finding of guilt." *Commissioner of Motor Vehicles v. Lee,* 254 Md. 279, 286 (1969). It has consistently and universally been defined and considered in the context of a criminal proceeding, as a punishment imposed upon conviction of a crime. *See, for example,* 36A C.J.S. *Fines,* § 1, quoted in *Lee, supra; also People Ex Rel. Doss v. Doss,* 342 N.E.2d 60, 63 (Ill. App. 1975): "Generally, a fine is a pecuniary punishment for a violation of law and relates to a criminal offense"; *Bergman v. State,* 60 P.2d 699, 700 (Wash. 1936): "A fine is a sum of money exacted, as a pecuniary punishment, from a person guilty of an offense. . ."; *State v. Pitts,* 548 P.2d 1202, 1203 (Ariz. App. 1976): "A fine is a criminal penalty . . . and clearly constitutes a 'sentence' . . ."; *Marquart v. Maucker,* 215 N.W.2d 278 (Iowa 1974); *Sinner v. State,* 260 N.W. 275 (Neb. 1935); *State v. Rugon, supra,* 355 So. 2d 876, 877; *Hart v. Norman,* 155 N.Y.S. 238 (S. Ct. 1915), *appeal denied,* 155 N.Y.S. 1112 (App. Div.); *South Carolina State Highway Dept. v. Southern Railway Co.,* 122 S.E.2d 422 (S.C. 1961).

As appellant points out, some state juvenile codes expressly permit the imposition of a fine in juvenile cases. *See, for example,* Me. Rev. Stat. Ann., tit. 15, § 3314 (1979); Ohio Rev. Code Ann., § 2151.355 (a) (6) (Supp. 1980) (fine

not to exceed fifty dollars); S.D. Comp. Laws Ann., § 26-8-39 (Supp. 1980) (fine not to exceed fifty dollars); Tenn. Code Ann., § 37-231 (5) (Supp. 1980) (fine not to exceed fifty dollars for each offense); Utah Code Ann., § 78-3a-39 (Supp. 1980) ("fines in limited amounts"); Va. Code Ann., § 16.1-279.E5 (1980 Supp.) (fine not to exceed five hundred dollars); and Wyo. Stat. Ann., § 14-6-229 (d) (ii) (1980 Supp.). The Maryland Code, however, makes no such provision. It permits the court to fine or imprison an *adult* upon conviction of contributing to a child's status as delinquent, in need of supervision, or in need of assistance (Courts Article, § 3-831); but nowhere in the range of dispositional options set forth in § 3-820 (b) is there any mention of or allusion to the imposition of a fine. Indeed, as is clear from the very nature of a fine, such an option would be entirely inconsistent with the current non-criminal thrust of our juvenile code. It is for that reason that we conclude that the court had no authority to impose the fine.

### (2) *Suspension of Driving Privileges*

Appellant's attack on the suspension of his driving privileges is a dual one. It rests in part on the same theory presented in connection with the fine — that such an option is not mentioned in § 3-820 (b), as it is in the juvenile codes of some other States, and for that reason does not exist. Second, he points out that the power to suspend or revoke driving privileges is committed exclusively to the Motor Vehicle Administration (MVA), an Executive Branch agency, and thus any purported exercise of that power by the juvenile court would not only be *ultra vires* but also a violation of the separation of powers principle embodied in article 8 of the Maryland Declaration of Rights. These issues are a bit more complex than the matter of the fine.

Preliminarily, we reject the notion that merely because an option or power is not expressly stated in § 3-820 (b) it does not exist. Although the court's discretion is not unbridled (*In re Johanna F.*, 284 Md. 643, 650 (1979)), it is broad, as indeed it must be if the court is to be able to implement the

"overriding consideration [of devising] a program of treatment, training, and rehabilitation best suited to the physical, mental, and moral welfare of the child consistent with the public interest," currently mandated by the statute. The provisions of § 3-820 (b) have to be considered *in pari materia* with the legislatively declared purposes of the juvenile code, as set forth in § 3-802 (a). The first-stated, and we think primally important, of these is "[t]o provide for the care, protection, and wholesome mental and physical development of children coming within the provisions of this subtitle; and to provide for a program of treatment, training, and rehabilitation consistent with the child's best interests and the protection of the public interest." To that end, § 3-802 (b) provides that the subtitle, including, of course, § 3-820 (a), "shall be liberally construed to effectuate these purposes."

In that light, it would be wrong to construe § 3-820 (b) in too restrictive a manner and to limit the court only to what is expressly contained in the three paragraphs of subsection (b). Subject to external constraints, which we shall discuss shortly, the court must be free to consider each child individually and to fashion a treatment plan (if one is needed) that takes account of his particular needs and situation. We noted the absence from § 3-820 of a power to fine (in contrast to its inclusion in other state juvenile codes) only because that power is so peculiarly related to criminal proceedings, and thus contrary to the main thrust of our juvenile code, rather than as something dispositive in and of itself.

Considering the facts revealed in the "social history," the court had an entirely legitimate concern that, if permitted to continue driving, appellant could be a significant danger to himself and to the public. It therefore was entirely appropriate for the court, in the exercise of its general authority to fashion and implement a reasonable and effective program of rehabilitation, to insist that appellant refrain from exercising the driving privilege accorded him by virtue of his driver's license. We have no doubt that such restraint could have been directly effected as part of a probation order — a *voluntary agreement* by appellant to surrender for a time

his privilege to drive as a condition of probation. Such a condition would have been consistent, in our judgment, with the goal of instructing appellant, in the words of *Davis, supra,* "of what is right and and what is wrong so as to be amenable to the criminal laws."

It is evident from this that the goal sought to be achieved here is not only an appropriate one, but one that is within the clear, albeit implicit, power of the juvenile court. The real issue before us is whether the court used an impermissible method of achieving that goal; the problem, in other words, is with the means, not the end.

There is, of course, a comprehensive set of laws governing driving in this State which, like Caesar's Gaul, seems to break down into three parts. We have, initially, a code of laws determining, in general, who may and who may not drive in Maryland. Those laws are set forth in Transportation Article, Title 16, which firmly and unequivocally commits their administration to MVA. A second element in the overall regulatory scheme is the series of laws governing the way in which people must (and must not) drive — the "rules of the road," so to speak — which are declared to be criminal laws, subjecting violators to criminal sanctions. Finally, there are laws and procedures for adjudicating alleged violations of those "rules of the road" and imposing penalties on convicted violators. Primary authority in this area is vested in the district court as part of its statutory criminal jurisdiction. *See* Courts Article, § 4-301 (a). However, where the alleged violation carries a possible sentence of incarceration and the accused is under eighteen, the juvenile court has exclusive jurisdiction over that offense and any other traffic offense arising out of the same incident. Courts Article, §§ 3-804, 4-301. Where that jurisdiction obtains, the offense, in effect, is "decriminalized." [3]

Naturally, there is an interrelationship among the three elements, the most obvious and relevant facet of which is

---

**3.** A bill permitting juveniles charged with driving while intoxicated or impaired to be tried as adults in the district court was introduced into the 1981 General Assembly, but it did not pass. *See* Senate Bill 986 (1981).

that a "conviction" by a court — a finding that a licensee has violated one or more of the rules of the road — can lead to a suspension or revocation of driving privileges by MVA. That, indeed, is the very connection allegedly intruded upon in this case.

We start with the first element — the regulation of drivers. Section 16-101 (Transportation Article) is the linchpin; it provides that a person may not drive a motor vehicle on any highway in Maryland unless (1) he "holds a driver's license issued under this title . . .," or (2) he is expressly exempt from the licensing requirements, or (3) he is otherwise specifically authorized to drive vehicles of the type he is driving.[4]

In accordance with statutory criteria (§§ 16-103, 16-103.1), MVA is empowered to issue learners' permits (§ 16-105), accept applications for licenses (§§ 16-106, 16-107), examine applicants (§§ 16-110, 16-111), and issue the appropriate licenses (§§ 16-111, 16-113, 16-114). Section 16-111 (d) expressly provides that "[w]hen issued and signed, *a driver's license authorizes the licensee to drive any vehicle of the type or class specified on it,* subject to any restrictions endorsed on the license." (Emphasis supplied.)

What MVA giveth, MVA may taketh away; but only for specific statutorily prescribed reasons and only in accordance with statutorily prescribed procedures and limitations. In the context of appellant's transgressions, §§ 16-402 and 16-404 are most relevant.

Section 16-402 provides for the assessment by MVA of "points" against a licensee upon conviction of violating the various rules of the road. Subsection (a) (21), in particular, provides for the assessment of twelve "points" for driving while intoxicated. Subject to the provisions of § 16-405, which do not appear to be applicable in this case, § 16-404 (a) requires MVA to "[r]evoke the license of each individual who accumulates 12 points." MVA must notify the licensee

---

4. Section 16-102 sets forth the exemptions and other specific authorizations referred to in § 16-101. They are not relevant to this proceeding.

of its action and afford him the opportunity of a hearing before the Administrator. Once revoked under § 16-404, a license may be reinstated by MVA only upon repassage of the examination given to new applicants.[5]

The juvenile code itself gives recognition to the administrative responsibility of MVA. Section 3-824, as noted earlier, declares that an adjudication of delinquency is not tantamount to a criminal conviction and does not impose the civil disabilities attendant to such a conviction; but it goes on to provide that "an adjudication of a child as delinquent by reason of his violation of the State vehicle laws shall be reported by the clerk of the court to the Motor Vehicle Administration, which shall assess points against the child under Title 16, Subtitle 4 of the Transportation Article, in the same manner and to the same effect as if the child had been convicted of the offense." [6] This provides the proper and efficient method of achieving the court's rehabilitative goal if, for whatever reason, a voluntary relinquishment of the license by the juvenile is not practicable. This is the legislatively crafted route for harmonizing the respective functions of the juvenile court and MVA without an undue infringement upon either.

The action of the juvenile court in this case was quite obviously not in harmony with the statutory scheme. It sus-

---

5. These sections are the most relevant to appellant's situation, but they are only part of MVA's overall authority to suspend and revoke drivers' licenses. Section 16-205 directly authorizes MVA to revoke the license of a person convicted of driving while intoxicated, quite apart from the § 16-404 authority to revoke by reason of "point" accumulation. Also, § 16-206 permits MVA to revoke or suspend a license if, after an administrative hearing, it finds that the licensee, "(1) Has been convicted of moving violations so often as to indicate an intent to disregard the traffic laws and the safety of other persons on the highways; [or] (2) Is an unfit, unsafe, or habitually reckless or negligent driver of a motor vehicle." To take action under § 16-206, MVA must comply with the notice and hearing requirements set forth in title 12, subtitle 2 of the Transportation Article. Upon revoking or suspending a license, MVA is required to take physical possession of it. Section 16-210.

6. It is interesting to note that, presumably acting pursuant to § 3-824, the clerk of the juvenile court (Montgomery County) notified MVA on an MVA form of appellant's adjudication as a delinquent, but failed not only to specify what charges were sustained, but to note the court's suspension of appellant's driving privileges. The only disposition noted on the form was "Placed on suspended commitment to Maryland Training School and fined $500." MVA would thus have no knowledge of the suspension.

pended appellant's driving privileges without purporting to suspend his license, which is inconsistent with § 16-111 (d), *supra*.[7] It ordered an indefinite suspension, which is inconsistent with the specific time limits on suspensions set by § 16-208 (a) of Transportation Article. And, equally important, it has placed appellant in a status of which MVA is completely unaware. If a juvenile court had that authority (and exercised it in the manner done here), the integrity of MVA's records would soon be placed in serious jeopardy. It could never be entirely certain of the actual driving status of its licensees under twenty-one years of age.

Given the clear thrust of the overall statutory scheme of regulation, we conclude that a juvenile court has no present authority directly to suspend a child's driving privileges upon a finding of delinquency. That is a power committed by statute exclusively to MVA.

For these reasons, we must vacate the two challenged paragraphs of the order. The juvenile court, of course, retains jurisdiction over appellant and may, as part of that continuing jurisdiction, continue or modify its program of rehabilitation in light of this result as it deems appropriate.

> *Orders imposing $500 fine and suspending appellant's driving privileges vacated; costs to be paid by Montgomery County.*

---

**7.** Section 11-128 defines a license to drive "as used in reference to the operation of a motor vehicle" as any "(1) Driver's license; and (2) any other license or permit to drive a motor vehicle that is issued under or granted by the laws of this State, including: (i) Any temporary license or learner's permit; (ii) *The privilege of any individual to drive a motor vehicle, whether or not that individual is formally licensed by this or any other jurisdiction;* and (iii) Any nonresident's privilege to drive, as defined in this subtitle." (Emphasis supplied.) By virtue of this definition, read literally but fairly, the court's suspension of appellant's privilege to drive may have been tantamount to a suspension of the license itself; but if that were the case, it would have been inconsistent with Transportation article, § 16-210, requiring the "suspender" to take physical possession of the license itself.