REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0017

September Term, 2013

JOHN R. LEOPOLD

v.

STATE OF MARYLAND

Wright,
Matricciani,
Salmon, James P.
  (Retired, Specially Assigned),

JJ.[1]

Opinion by Wright, J.

Filed: March 26, 2014

[1] Judge Robert A. Zarnoch and Judge Douglas R. M. Nazarian did not participate in the Court's decision to designate this opinion for publication in the Maryland Appellate Reports pursuant to Md. Rule 8-605.1.

Appellant, John R. Leopold, appeals his conviction in the Circuit Court for Anne Arundel County for two counts of misconduct in office. On March 2, 2012, Leopold was charged by indictment with four counts of misconduct in office (Counts 1-4) and fraudulent misappropriation by a fiduciary (Count 5). A bench trial began on January 18, 2013, and continued until January 29, 2013, at which time the circuit court found Leopold guilty of Counts 1 and 3. He was acquitted of the remaining charges.[1]

On March 14, 2013, Leopold was sentenced to two years' imprisonment with all but 60 days suspended on Count 1. An identical and concurrent sentence was imposed as to Count 3. In addition, Leopold was placed on 5 years of supervised probation, ordered to pay a fine of $100,000.00, and ordered to complete 400 hours of community service by December 31, 2013. As a special condition of probation, the circuit court prohibited Leopold from "be[ing] a candidate for any local, state, or federal elected office." On March 15, 2013, Leopold filed this appeal.

## Questions Presented

Leopold asks:

1.    Whether the charge of Misconduct in Office, as applied to the facts of this case, denied Leopold due process of law as being unconstitutionally vague and overbroad?

2.    Whether the sentence imposed was illegal?

---

[1] The court granted Leopold's motion for judgment of acquittal as to Count 2 and found him not guilty of Counts 4 and 5.

**Facts**

Leopold was twice elected to the office of the County Executive of Anne Arundel County. He was first sworn into office on December 4, 2006, and was reelected on November 2, 2010. Leopold succeeded Janet Owens who, during her time as County Executive, formed the Executive Protection Detail ("EPD") for the purpose of "provid[ing] security and protection to the County Executive while she was conducting County business."

The EPD consisted of sworn officers of the Anne Arundel County Police Department, known as Executive Protection Officers ("EPO"), each of whom was requested to have at least ten years of police experience prior to being selected for the unit. According to Patrick Shanahan, the Chief of Police at the time of the EPD's formation, the EPD was formed "rather quickly, . . . by the seat of our pants, and we used as a basis for how that unit operated how other departments did theirs and followed State Law." Shanahan testified that, although a standard operating procedure ("SOP") was "later" created for the EPD, one did not exist at the time of the EPD's formation. According to Lieutenant Katherine Goodwin, an EPO who served during Owens's tenure, no "written protocol governing the do's and don'ts for the [EPD]" existed at the time of Leopold's trial.

Corporal Joseph Pazulski, an EPO who served under both Owens and Leopold, testified that his initial duties in the EPD were:

to pick Ms. Owens up at her residence, take her to her office which was at the Arundel Center in Annapolis. I would take her from event to event throughout the day and then I would also drop her off at the end of our tour of duty at her home. And our responsibilities were to be a driver as well as her security.

Cpl. Pazulski also testified to running personal errands for Owens, such as getting a pack of cigarettes or buying her lunch.[2] Cpl. Pazulski explained that he did so:

[d]uring our workday if Ms. Owens was in the office and had a block of hours where she was having meetings at the office, we were stationed right there on the fourth floor, on the same wing as Ms. Owens's office and if I would go to lunch if I knew that she was going to be tied up during that day I would let her know that I was going to lunch, leaving the building and occasionally she asked me to bring her a sandwich back or grab her cigarettes on the way back.

Cpl. Pazulski stated that he "didn't do any campaigning" for Owens, but admitted that he had some "involvement with campaign signs." When asked to elaborate, he answered:

If someone requested a campaign sign, there were campaign signs in our County vehicle that we drove. And if someone would request it I would just come out and hit the remote control on the trunk, the trunk would open, and the interested person would take the signs that they wanted and I would close the trunk.

Cpl. Pazulski stated that he did not place Owens's campaign signs in the trunk nor did he know who did. Cpl. Pazulski recalled that when signs were distributed, "sometimes [Owens] would be [present], sometimes she would not." Cpl. Pazulski testified that he

---

[2] Without elaborating, Lt. Goodwin, another EPO, testified that there were times when she drove Owens to the Baltimore Symphony and to the supermarket "while [Owens] ran in and bought groceries."

sometimes took Owens to her campaign events, "if [he] was working as her security." He stated that he never volunteered to assist in Owens's campaign and never touted her candidacy while he was present at her events. Cpl. Pazulski added that, during the Owens administration, EPOs kept records of mileage used for activities that were unrelated to Owens's role as County Executive, including mileage spent on campaign work. The EPOs, however, did not record the amount of time that the EPD spent in protecting Owens. The EPD continued to protect Leopold when he succeeded Owens as County Executive.

On January 15, 2010, Leopold contacted Dr. Roy Bands, Jr., an orthopedic surgeon, "complaining of lower back pain and discomfort into his legs and his feet primarily while standing and walking." After evaluating Leopold and discussing the treatment options, Dr. Bands gave Leopold a Cortisone injection on January 28, 2010. Thereafter, Leopold became more symptomatic and was writhing in pain during his next visit to Dr. Bands's office.

On February 23, 2010, Dr. Bands performed a six-hour spinal surgery on Leopold, which included a laminectomy[3] and stabilization of the bones.[4] After the surgery, Leopold "wasn't urinating on his own" and therefore, Dr. Bands reinserted a Foley

[3] Dr. Bands stated that a laminectomy involved "unroofing the spinal canal . . . and . . . unpinching the nerves."

[4] Dr. Bands testified that they "typically . . . use rods and screws in addition to bone graft to stabilize the bones."

4

catheter that remained with Leopold following his discharge from the hospital.  The catheter drained in a tube to a collection bag strapped to Leopold's ankle.  Upon Leopold's release from the hospital, Dr. Bands stated that Leopold would not be able to "bend over to put his socks on, . . . change a dressing, . . . empty his own foley bag . . . , [or] drive a car."

Despite the surgery, Leopold continued to have low back pain.  On July 2, 2010, Leopold consulted Dr. Timothy Burke, a neurological surgeon, who "came up with a surgical plan on how to deal with th[e] problem."  On July 16, 2010, Leopold underwent another operation, this time to revise the fusion and to repair the fluid cyst that resulted from "a tear of the covering of the spinal canal."

Cpl. Pazulski testified that after the surgeries, Leopold's level of independence changed.  Two other EPOs, Corporal Howard Brown and Corporal Mark Walker, stated that they often drained urine from Leopold's collection bag into an empty coffee can for disposal.  Cpl. Brown recalled that Leopold directed him to purchase the coffee container, which Cpl. Brown cleaned out and stored in the center console of the County Executive's vehicle.  Cpl. Brown stated that he changed the catheter bag because he "was told to do it" and "didn't think [he] had much recourse."  Cpl. Walker, who testified to draining Leopold's urine at least 40 times, stated that he did not consider draining the catheter a part of his duties as an EPO but continued to do so because "Mr. Leopold told me to."  At no time did Cpl. Walker tell Leopold that he did not want to drain the collection bag.

Cpl. Brown and Cpl. Walker reported their assignments to their supervisors on a regular basis. At no time did those supervisors instruct the EPOs not to undertake or participate in any of the activities assigned by Leopold. At trial, Cpl. Brown and Cpl. Walker admitted that they did not believe their actions – in conjunction with Leopold's urine collection bag – to be criminal.

Patricia Medlin, an assistant to Leopold, was, at the time of trial, 63 years old and a 16-year government employee of Anne Arundel County. Her entire career with the County was, in some capacity, within the County Executive's Office. In 2006, Leopold asked Medlin to become his scheduler. Medlin, who was asked to decide then and there, gave up her position as a "merit employee" to become an "at will employee." She believed that, by taking the position being offered by Leopold, she would serve at the pleasure of her employer, would have no job protection, and would have no job at the end of Leopold's administration.

Medlin recalled that following Leopold's first surgery, he called her into his office and told her that he had a catheter bag that he would not be able to empty and that he would "require" her assistance. When Leopold asked if she had a problem with it, Medlin said no because she "was afraid" to say otherwise. When asked to elaborate, Medlin explained:

> Because it was my experience that, oh how do I say this, that you don't tell him no because then he thinks your [sic], he would consider you unloyal [sic] and I mean people lost their jobs, I've seen it. And I need my job. So I - - I just didn't say no because I was scared of losing my job.

Thereafter, she drained the collection bag about two or three times a day for approximately nine to ten months.

According to Medlin, whenever Leopold stood in the doorway of his office and said, "Patty, I need you now," she knew that she needed to help empty the collection bag. Medlin would go to the bathroom, put gloves on, obtain the coffee can from under the sink, get down on her hands and knees, empty the urine out of the catheter bag into the can, empty the can into the toilet, and rinse out the can. Medlin continued to perform the task until she walked into Leopold's office one day and found him with his "foot bent and propped way up on [a heating register] and was bent over tying his shoe." At that point, Medlin "realized that he could have been emptying his own catheter." She did not say anything to Leopold but instead returned to her desk. Medlin recounted that minutes later, Leopold came out of his office, walked over to a window near Medlin's desk, and "puts his foot up on the heat register, standing beside [Medlin], and then was just looking out the window."

At trial, evidence was presented that on April 22, 2010 – two months after Leopold's first surgery – a physician from Anne Arundel Urology gave Leopold a catheter plug to replace the urine collection bag. The medical report stated:

> [Leopold] was given a "tru-flo" catheter plug and traditional catheter plug and instructions regarding use were reviewed. [Leopold] was advised that he may use catheter plug during the day with the understanding that he must drain his bladder [every] 2 hours. [Leopold was] advised that he must connect catheter to drainage bag at night. [Leopold] verbalize[d] understanding.

Leopold, however, continued to ask Medlin for assistance several months after he received the catheter plug.

As Leopold was recuperating from his surgeries, he enlisted the help of EPOs for his reelection campaign. Cpl. Brown and Cpl. Walker were instructed to pick up campaign contributions from donors and to deposit them into the campaign bank account. Cpl. Brown also testified to creating dossiers on persons whom Leopold perceived to be political opponents, including Joanna Conti, his opponent in 2010. According to Cpl. Brown, those files included results from researching "judicial case search, their residence, anything on Google[,] . . . MVA . . . or . . . NCIC."[5]

On one occasion, both Cpl. Brown and Cpl. Walker were asked to unload approximately 1,000 campaign signs from the vehicle of Erik Robey, the assistant to Leopold's Chief Administrative Officer, and to place them in the basement of Leopold's home. In the days that followed, Leopold directed the EPOs to distribute those signs to people who came to Leopold's house and requested them. In addition, Cpl. Walker was instructed to place signs on people's properties around the county. Thereafter, the EPOs checked to make sure that the signs remained in place on a daily basis. For the most part, Leopold was not present when the EPOs performed these activities. Following the election, Leopold "required" that the EPOs collect the signs they placed around the

---

[5] "MVA" is the abbreviation for the Motor Vehicle Administration and "NCIC" refers to the National Crime Information Center.

county and return them to his home.

Cpl. Brown testified that when he first began to put signs up, he told Leopold that he "didn't think it was a good idea," but Leopold directed him to continue. Cpl. Brown complied because he was "fearful what the retribution would be if I told him I wasn't going to do something." According to Cpl. Brown, "[y]ou don't tell Mr. Leopold no." On cross-examination, Cpl. Brown admitted that on one occasion, he refused Leopold's order to remove a Conti campaign sign and "nothing happened" to him as a consequence. He added, however, that Leopold "wasn't real happy about it."

Robey, Leopold's top aide during the campaign, did not think that what the EPOs were doing was "illegal." Medlin, on the other hand, told Leopold around August 2010 that "he shouldn't have the officers putting up signs because that was not legal." Sergeant Timothy Phelan, a part-time EPO during Leopold's administration who testified at trial, recalled an incident where Leopold declined Sgt. Phelan's offer to "fix a [campaign] sign out on the road" and stated that "he [Leopold] had to do it because [Sgt. Phelan] wasn't supposed to be doing this."

In a ten-page indictment on March 2, 2012, Leopold was charged with four counts of misconduct in office and one count of fraudulent misappropriation by a fiduciary. Counts I and III, of which he would later be found guilty, stated in pertinent part:

**COUNT ONE – MISCONDUCT IN OFFICE**
<u>Misfeasance – Misuse of Executive Protection Officers for Political</u>
<u>and Campaign Activities</u>
* * *

9

65. Between on or about June 25, 2010 and continuing to on or about November 16, 2010, at Anne Arundel County, Maryland, JOHN R. LEOPOLD, did, corruptly and in violation and perversion of his duties as the duly sworn County Executive of Anne Arundel County, to uphold, enforce and obey the laws of Anne Arundel County and the State of Maryland, commit misfeasance in office by knowingly, willfully and intentionally requiring, under the color of office, that Anne Arundel County employees, specifically, executive protection detail officers assigned to protect him, perform political and campaign activities and tasks while on duty and being paid by county monies, in violation of the common law and against the peace, government and dignity of the State.
*Common Law*

\* \* \*

## COUNT THREE – MISCONDUCT IN OFFICE
Misfeasance – Misuse of County Employees for Personal Purposes

\* \* \*

70. Between on or about February 17, 2010 and continuing to on or about May 15, 2011, at Anne Arundel County, Maryland, JOHN R. LEOPOLD, did, corruptly and in violation and perversion of his duties as the duly sworn County Executive of Anne Arundel County, to uphold, enforce and obey the laws of Anne Arundel County and the State of Maryland, commit misfeasance in office by knowingly, willfully and intentionally requiring, under the color of office and for his personal purposes, [that] Anne Arundel County employees, perform tasks and activities for his personal purposes and not for County purposes during the course of their regular work day and while being paid by county monies, in violation of the common law and against the peace, government and dignity of the State.
*Common Law*

A bench trial took place from January 18-29, 2013. At the conclusion, as to the above two counts, the circuit court, in finding Leopold guilty, ruled in pertinent part:

In Maryland, misconduct in office is a Common Law misdemeanor. It is corrupt behavior by a public officer in the exercise of the duties of his office or while acting under the color - - the color of his office.

\* \* \*

The Maryland cases have recognized that the corrupt behavior can be

10

characterized in various ways such as the doing of an act which is wrongful in and of itself, malfeasance, the doing of an act otherwise lawful in a wrongful manner, misfeasance, or the omitting to doing an act which is required by the duties of the office, nonfeasance.

Within each of the misconduct counts the State acknowledges that it must show that the Defendant acted corruptly and in violation and perversion of his duties as County Executive. And it also acknowledges that it must show that the Defendant committed each count knowingly, willfully, and intentionally.

What corruptly means in this context has not been well defined. Some guidance is supplied by the commentary to the Maryland Pattern Jury Instructions in support of its instruction on misconduct in office . . . .

\* \* \*

This Court . . . concludes that the Common Law, Maryland crime of misconduct in office is not unconstitutionally vague as a violation of due process.

\* \* \*

Misconduct in office is defined as corrupt behavior by a public officer in the exercise of the duties of his office or while acting under color of his office. An act or conduct unrelated to the public official's duty, even if it is a violation of the Criminal Law will not amount to misconduct in office.

\* \* \*

The first count is Count 1 of misconduct in office, which concerns the misuse of Executive Protection officers allegedly for political and campaign activities. . . .

\* \* \*

The first area is unloading of campaign signs. . . .

\* \* \*

The second area concerns sign placement and retrieval . . . .

\* \* \*

The third area is collection of campaign checks . . . .

\* \* \*

The fourth area is the creation of what is called dossiers . . . .

\* \* \*

The Defendant's efforts to involve his Executive Protection Officers in political and campaign activities as described above in the discussion of each of these incidents - - his efforts were extensive and pervasive to the

11

extent that at times the officers were working primarily on Leopold's campaign activities while on duty. Defendant was not only aware of this work, he directed that it be done, giving detailed and specific commands to the officers on such matters as addresses to place lawn signs and areas to be patrolled to ensure that signs continue to be in place.

Defendant was his own campaign manager. And Defendant was alerted on several occasions by his staff and by the officers themselves, that having the officers conduct such activities, while on duty, was questionable, not wise or potentially illegal.

At one point around August 2010, Ms. Medlin told him that he should not have officers putting up the signs quote, "Because it is not legal," end quote. According to Ms. Medlin he did not dispute this assertion or respond to it at all. Mr. Robey also told the Defendant he did not think having the officers put in signs was appropriate and suggested that the campaign hire college student [sic] to do it instead of having the officers do it. The Defendant rejected this suggestion.

After such warnings the Defendant not only ignored the warning from those close to him but continued the wrongful activity and accelerated it. The record indicates that at least on one occasion the Defendant acknowledged that he understood that having an on duty officer place signs along the highway was not allowed. Despite this awareness the Defendant proceeded to demand more campaign activity of the officers on behalf of his candidacy as the election neared.

\* \* \*

It should have come to no surprise to Defendant that employing on duty sworn police officers to work on his election campaign was wrongful and illegal. Section 13-303 of Article XXIV of the Maryland Code provides that an employee of a local entity may not be required to provide any political service. Section 13-105 further provides that an employee of a local entity, which Anne Arundel County is a local entity, may not engage in political activity while on the job during working hours.

\* \* \*

Defendant, as an individual with decades of Governmental and election experience, was beyond a doubt aware that requiring [] on duty police officers to perform substantial services for his reelection campaign was wrongful and illegal.

\* \* \*

12

By wrongfully taking substantial advantage of free public employee help for his campaign, an asset unavailable to his opponent, Defendant was placing his thumb on the scales of our political system to heavily tilt it in his favor. These actions robbed Anne Arundel County citizens of the fair political electoral process they were entitled to receive.

Defendant's actions were done systematically during the election season of 2010. Defendant committed these acts knowingly, willfully and intentionally and under the color of his office as County Executive. He did so corruptly and is guilty of this offense.

As to Count 3, Count 3 charges the misuse of County employees for personal purposes . . . .

In theory[,] one could abstractly divide the actions of a County Executive into three categories, governmental, political and personal . . . .

. . . There is no evidence that the officers were to make any distinction about whether an event was governmental, political or personal. There was virtually no guidance given in the SOP about activities that were not to be performed by the officers.

Similarly, the personal staff of the County Executive, such as Ms. Medlin, who were not merit system employees, were aid[e]s to the County Executive and the record does not demonstrate any particular constraints that apply to them except that it appears that the restrictions on political activity during the work day, contained in Article XXIV of the Maryland Code, would apply.

There are five major categories described in the Indictment relating to this Count . . . .

\* \* \*

The final area[6] under this Count is, - - the urinary catheter collection

---

[6] The court concluded that the first four activities described in the Indictment were not misconduct in office. Those four included: directing his staff to manage conflicts between his live-in partner and girlfriend; directing EPOs on a regular basis to drive him to a parking lot where he could spend time with his girlfriend; directing EPOs to run personal errands such as banking and to pick up newspapers and food; and requiring

13

bag duties . . . .

\* \* \*

Defendant's demands on the officers and Ms. Medlin to care for his catheter bag are simply outrageous, egregious and wildly beyond any authority he possessed or could reasonably have thought he had obtained by virtue of his office. The task is one that with anyone - - anyone would have extreme difficulty asking someone else, even with a spouse or close relative, to do. The Defendant expected the police officers and Ms. Medlin to perform this task for him without comment, or complaint, demonstrates an overbearing arrogance and sense of entitlement and is unworthy of someone who is supposed to be a public servant.

Defendant's conduct in regards to Ms. Medlin is particularly egregious. She had told the Defendant when she took the job in 2006 that she was very concerned about doing so since she was moving from a merit system job to one that was, quote, At-Will, end quote. He was aware of her age and the potential difficulties that she might have if she lost her job including the effect on her retirement.

Given this knowledge and the power - - and the power imbalance between the Defendant and Ms. Medlin, his conduct appears predatory and cruel.

\* \* \*

This continuing abusive and outrageous conduct exceeded any right that any employer, either private or public, would have to demand of employees who were hired to perform office or security work. The fact that Ms. Medlin was labeled quote, a confidential assistant, end quote, did not provide license to Defendant to misuse Ms. Medlin as he did.

\* \* \*

In this Court's view the State has shown by proof beyond a reasonable doubt from this incident that the Defendant's conduct constituted criminal misconduct in office. Defendant committed these acts knowingly, willfully and intentionally and under the color of his office as County Executive. He did so corruptly and is guilty of this offense.

---

EPOs to be present during his hospital stay.

14

**Discussion**

"When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence." Md. Rule 8-131(c). We "will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." *Id.* *See also State v. Albrecht*, 336 Md. 475, 478 (1994); *Choi v. State*, 134 Md. App. 311, 318-19 (2000). In so doing, "[w]e must consider the evidence in the light most favorable to the prevailing party and decide not whether the trial judge's conclusions of fact were correct, but only whether they were supported by a preponderance of the evidence." *Sifrit v. State*, 383 Md. 77, 93 (2004) (citation omitted). "The deference shown to the trial court's factual findings under the clearly erroneous standard does not, of course, apply to legal conclusions." *Goff v. State*, 387 Md. 327, 338 (2005) (citation omitted). Rather, "[w]hen the trial court's [decision] involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are legally correct under a *de novo* standard of review." *Id.* (citation omitted).

**I.     Due Process**

Leopold first argues that he was "deprived of due process, fair notice, and non-discriminatory application of the law." He contends that because the term "misconduct in office" is vague and amorphous and "does not delineate standards of conduct nor the basis for duties alleged to be violated," the term has been "susceptible to arbitrary

15

application." Leopold broadly asserts that common law misconduct in Maryland does not afford him notice because the conduct alleged in the indictment is not clearly and unequivocally prohibited. Leopold notes that misconduct in office has been held by Maryland courts to include bribery, falsification of information or obstruction of justice, facilitation of the commission of an offense, and misappropriation of or failure to safeguard money or property. Because he was not alleged to have committed any of those acts, however, Leopold avers that the case law does not offer any notice to him or to others that his actions could or would be construed to be violations of the law.

In response, the State argues that "the common law crime of misconduct in office is not unconstitutionally vague and overbroad, nor is it unconstitutional as applied." The State also disagrees with Leopold's assertion that misconduct in office should be bridled to include a list of only six specific acts simply because those "criminal actions make up the majority of misconduct in office cases." The State suggests that, like the appellant in *Chester v. State*, 32 Md. App. 593 (1976), Leopold demanded certain acts from his employees and coupled that demand with the threat of discharge from office and, therefore, the court correctly found him guilty of misconduct in office.

"In Maryland, misconduct in office is a common law misdemeanor." *Duncan v. State*, 282 Md. 385, 387 (1978) (footnote omitted). It has been defined as "corrupt behavior by a public officer in the exercise of the duties of his office or while acting under color of his office." *Id.* (citing Perkins on Criminal Law 485 (2d ed. 1969);

16

*Hitzelberger v. State*, 174 Md. 152 (1938)). The corrupt behavior may be: (1) the doing of an act which is wrongful in itself, or "malfeasance;" (2) the doing of an act otherwise lawful in a wrongful manner, or "misfeasance;" or (3) the omitting to do an act which is required by the duties of the office, or "nonfeasance." *Id.* (citations omitted). Acts that qualify as misconduct in office include:

> neglect or non-performance of any positive duty imposed by law; *oppressive and wilful abuse of authority* (to be distinguished from mere error of judgment); extortion; fraud or breach of trust affecting the public, such as rendering, passing or procuring false accounts, or wilfully neglecting to account for money received, or corruptly retaining money found upon a prisoner; grossly indecorous conduct, such as sitting as a justice while drunk, or getting drunk during time of service as a grand juror.

*Chester*, 32 Md. App. at 606 (citation omitted and emphasis added).

In this case, the circuit court found that Leopold was guilty of misconduct in office because he "wrongfully [took] substantial advantage of free public employee help for his campaign" and demanded, in a "predatory and cruel" manner, that his assistant empty his urine collection bag. We agree with the circuit court.

In *Chester*, this Court upheld the appellant's conviction for misconduct in office where the appellant was said to have demanded political contributions from his employees "and coupl[ed] that demand with the threat of discharge from office." Likewise, here, we uphold Leopold's conviction on Count 1 because there was evidence to support the circuit court's finding that Leopold directed EPOs to wrongfully engage in "campaign activity" on his behalf, as well as testimony that the EPOs complied only

17

because "[y]ou don't tell Mr. Leopold no." Although Leopold did not explicitly threaten his employees, he placed them in a position where they could not refuse his directions. In addition, the circuit court relied on the fact that Leopold was repeatedly advised and, on one occasion, acknowledged understanding, "that having an on duty officer place signs along the highway was not allowed." *See* Md. Code (2013 Repl. Vol.), § 1-304 of the Local Government Article[7] ("An employee of a governmental entity may not: (1) engage in political activity while on the job during working hours . . . .").

We also uphold Leopold's conviction with regard to Count 3. As we stated in *Chester*, 32 Md. App. at 606, a public officer is guilty of misconduct in office when he or she oppressively and wilfully abuses his or her authority. Here, there was evidence to support the trial court's finding that Leopold "expected" the EPOs and Medlin to empty his urine collection bag, a task that "anyone would have extreme difficulty asking someone else . . . to do." Medlin was very concerned when she accepted Leopold's offer for employment "since she was moving from a merit system job to one that was . . . At-Will[,]" and Leopold was aware of Medlin's "age and the potential difficulties that she might have if she lost her job." Leopold's continuing demands for Medlin to attend to his catheter bag, despite having been provided with a catheter plug months prior, was abusive and outrageous, and given the power imbalance between the two, Leopold's conduct was

---

[7] At the time of Leopold's trial, this statute was codified at Md. Code (1957, 2011 Repl. Vol.), Art. 24, § 13-105. The Revisor's Note states that "[t]he only changes are in style."

18

predatory, cruel, prompted by ill motive, and would constitute oppressive and wilful abuse of authority.

Making a similar argument to that made above, Leopold cites *Giaccio v. Pennsylvania*, 382 U.S. 399, 402-03 (1966), and avers that the charge of misconduct in office "fails to meet the requirements of the Due Process Clause [because] it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case."[8] Leopold avers that misconduct in office was never codified in Maryland, and that convictions for that crime have been upheld "where there have been acts of bribery, falsifying information or obstructing justice, facilitating the commission of an offense, or misappropriating of or failing to safeguard money or property." (Footnotes omitted). Because Leopold asserts that he did not commit these acts, he contends that he should not have been found guilty of Counts 1 and 3. According to Leopold, "[t]here are no cases with holdings that offer any notice" to him that his actions "would be construed to be violations of the law" and "'[r]eading the statute to proscribe a wider range of offensive conduct . . . would raise due process concerns

---

[8] Quoting the trial transcript at length, Leopold attempts to inject meaning to the circuit court's line of questioning by suggesting that the court believed the definition of misconduct to be "amorphous." However, the bottom line – and the issue properly before us for review – is that the court ultimately found Leopold guilty of misconduct in office.

19

underlying the vagueness doctrine.'"[9]  (*Quoting Skilling v. United States*, 561 U.S. 358,

130 S. Ct. 2896, 2931 (2010)).

This Court has previously reiterated the standards for evaluating vagueness as

follows:

> Vague laws offend several important values.  First, because we assume that
> man is free to steer between lawful and unlawful conduct, we insist that
> laws give the person of ordinary intelligence a reasonable opportunity to
> know what is prohibited, so that he may act accordingly.  Vague laws may
> trap the innocent by not providing fair warning.  Second, if arbitrary and
> discriminatory enforcement is to be prevented, laws must provide explicit
> standards for those who apply them.  A vague law impermissibly delegates
> basic policy matters to policemen, judges, and juries for resolution on an ad
> hoc and subjective basis, with the attendant dangers of arbitrary and
> discriminatory applications.  (Footnotes omitted).

*In re William G.*, 52 Md. App. 131, 133-34 (1982) (quoting *Grayned v. City of Rockford*,

408 U.S. 104, 109 (1972)).  "A law is not vague simply because it requires conformity to

an imprecise normative standard."  *Eanes v. State*, 318 Md. 436, 459 (1990).  "The

---

[9] Leopold also contends that the State switched from a misconduct prosecution based on misfeasance to one based on malfeasance, and that he did not have fair notice of the offense for which he was charged.  The State denies that such was the case.  Because, in the end analysis, the crime of misconduct in office – of which he had notice – encompasses both misfeasance and malfeasance, we need not address Leopold's contention.

Leopold's "argument," which he mentioned but seemed to have abandoned in his brief, "could also be rejected out of hand because it is inadequately briefed."  *Bert v. Comptroller of the Treasury*, 215 Md. App. 244, 269 n.15 (2013).  "'[A]rguments not presented in a brief or not presented with particularity will not be considered on appeal.'"  *Id.* (quoting *Diallo v. State*, 413 Md. 678, 693 (2010) and citing *Klauenberg v. State*, 355 Md. 528, 552 (1999); *Rohrbeck v. Rohrbeck*, 318 Md. 28, 38 n.4 (1989); and *Beck v. Mangels*, 100 Md. App. 144, 149 (1994)).

touchstone is whether persons of common intelligence need reasonably guess at its meaning." *Id.* (citation omitted).

As the State notes in its brief, "[t]here are areas of human conduct where, by the nature of the problems presented, legislatures simply cannot establish standards with great precision." *Smith v. Goguen*, 415 U.S. 566, 581 (1974). "It is self-evident that there is a whole range of conduct that anyone with at least a semblance of common sense would know is contemptuous conduct and . . . [i]n these instances, there would be ample notice to the actor." *Id.* at 584 (White, J., concurring). Such is the case here. As the circuit court found, Leopold's actions were "outrageous, egregious and wildly beyond any authority he possessed or could reasonably have thought he had obtained by virtue of his office." The person of ordinary intelligence would know that it is a violation of the law to direct your subordinates to engage in illegal activity, or to oppressively and wilfully abuse his or her authority to require an employee to perform offensive and unnecessary tasks wholly beyond their job descriptions.[10] For these reasons, we reject Leopold's contention that his constitutional rights were violated when the court convicted him of misconduct in office.

---

[10] The circuit court found that allegations regarding use of the EPOs' cell phone for private calls was "trivial and hardly amount[ed] to official misconduct." As to "menial personal errands," given the "lack of any detailed guidelines," it was hard to ascribe criminal liability to activities performed by the officers.

## II.    Illegal Sentence

Next, Leopold argues that "the court imposed an illegal sentence when as a condition of probation it prohibited [him] from running for office." Specifically, Leopold avers that "the separation of powers precludes trial courts from interfering in areas where the Legislature left the question of eligibility on who may seek elected office to the County Council and General Assembly." We agree with Leopold and hereby strike this condition of his sentence.

"[A]n illegal condition of probation can be challenged as an illegal sentence." *Carter v. State*, 193 Md. App. 193, 209 (2010) (citation omitted). Pursuant to Md. Rule 4-345(a), "[t]he court may correct an illegal sentence at any time." Thus, "[w]e may correct an illegal sentence on appeal even if no objection was made in the trial court." *Addison v. State*, 191 Md. App. 159, 183 (2010) (citing *Ridgeway v. State*, 369 Md. 165, 171 (2002)).

Indeed, "[a] judge has very broad discretion when imposing conditions of probation 'and may make such orders and impose such terms as to . . . conduct . . . as may be deemed proper . . . .'" *Sheppard v. State*, 344 Md. 143, 145 (1996) (quoting Md. Code (1957, 1996 Repl. Vol.), Art. 27, § 639(a)). That discretion, however, is not unlimited. *Id.* For example, appellate courts have held certain conditions of probation to be improper where the conditions violated the separation of powers. *See id.* at 145, 154 (holding that "the trial judge abused his discretion in ordering, as a condition of

probation, that Sheppard not operate a motor vehicle even if the MVA returns her driver's license" because "[t]he Transportation Article . . . statutory scheme of regulation delegated to the executive branch controls over the general statute authorizing a court to impose conditions of probation"); *Towers v. State*, 92 Md. App. 183, 194 (1992) (holding that the trial court could not impose a probation condition that defendant not work in pharmacy without the court's permission even if defendant obtained license, because "the Legislature has left [the licensing and regulation of pharmacists] to the State Pharmacy Board, not the Circuit Court for Caroline County"); *Smith v. State*, 80 Md. App. 371, 374 (1989) (holding that the trial court was without jurisdiction to impose a condition of probation prohibiting defendant from seeking to regain custody of her children without prior approval, following conviction of defendant for child abuse pursuant to guilty plea, because "[j]urisdiction over the children rests with the Juvenile Court of Baltimore City"); *see also In Re David K.*, 48 Md. App. 714, 725 (1981) (concluding that "a juvenile court has no present authority directly to suspend a child's driving privileges upon a finding of delinquency" because "[t]hat is a power committed by statute exclusively to MVA"); *accord Sheppard v. State*, 344 Md. 143, 154 (1996) ("This specific statutory scheme of regulation delegated to the executive branch controls over the general statute authorizing a court to impose conditions of probation.").

The case of *U.S. v. Richmond*, 550 F.Supp. 605 (1982), is instructive here. In that case, the defendant, "a Member of Congress, agreed to plead guilty to income tax evasion

23

(26 U.S.C. § 7201), supplementing the salary of a federal employee (18 U.S.C. § 209) and possession of marijuana (21 U.S.C. § 844)." *Id.* at 606. "He also undertook to immediately resign from Congress and withdraw as a candidate for re-election" and, in turn, the government "consented not to prosecute him for a variety of other crimes." *Id.* The United States District Court for the Eastern District of New York held that "those portions of the plea agreement pertaining to resignation from Congress and withdrawal as a candidate for re-election are void" because "[t]hey represent an unconstitutional interference by the executive with the legislative branch of government and with the rights of the defendant's constituents." *Id.*

Similarly, here, the condition of probation imposed by the circuit court on Leopold must be stricken because, as asserted by Leopold, "the separation of powers precludes trial courts from interfering in areas where the Legislature left the question of eligibility on who may seek elected office to the County Council and the General Assembly." In Maryland, the Election Law Article establishes the requirements for candidacy for public office. *See* Md. Code (2003, 2010 Repl. Vol.), § 5-202, *et seq.,* of the Election Law Article ("EL") (listing, among others, minimum qualifications and residency requirement). In addition, "[u]nder the constitution of Maryland, Art. 1, Section 4 and Section 12, one must be a qualified and registered voter in order to vote and to serve in an elective office." *U.S. v. Slatkin*, 984 F. Supp. 916, 921 (D. Md. 1995). In turn, an individual is disqualified from being a registered voter if he or she:

24

(1) has been convicted of a felony and is actually serving a court-ordered sentence of imprisonment, including any term of parole or probation, for the conviction;

(2) is under guardianship for mental disability and a court of competent jurisdiction has specifically found by clear and convincing evidence that the individual cannot communicate, with or without accommodations, a desire to participate in the voting process; or

(3) has been convicted of buying or selling votes.

EL § 3-102(b).

Leopold has not been convicted of a felony or of buying or selling votes, nor is he under guardianship for mental disability, thus qualifying him to be a registered voter. As a registered voter and a Maryland resident, and without evidence to the contrary, he is qualified and eligible to run for office pursuant to the Election Law Article and the Maryland Constitution.

Based upon the statutory scheme currently in place, Leopold may be removed from office "by operation of law" if "found guilty of any crime . . . which is a misdemeanor related to the elected official's public duties and responsibilities and involves moral turpitude for which the penalty may be incarceration in any penal institution." Md. Const. art. XV, § 2; *see Hall v. Prince George's Cnty. Democratic Cent. Comm.*, 431 Md. 108, 111 (2013) (Speaker of the House of Delegates, acting on the advice of Assistant Attorney General, declared a delegate removed from her House seat by operation of law "after she had been convicted and sentenced for the common law offense of misconduct in office"). This is consistent with the provisions of the Anne Arundel County Charter,

25

which states that "[t]he office of the County Executive may be declared vacant by ordinance of the County Council with an affirmative vote of not less than five (5) members if, during his elected term, the County Executive . . . is found guilty of . . . a crime involving moral turpitude or misfeasance or malfeasance in office[.]" Anne Arundel County Charter, art. IV, § 404. Because the Maryland Constitution and County Charter provide a method by which to remove the County Executive, we agree with Leopold that the circuit court, by prohibiting Leopold from being a candidate for elected office as a special condition of probation, improperly interfered with the process that has been put in place by the Legislature.

Relying on our recent decision in *Henson v. State*, 212 Md. App. 314, *cert. denied*, 434 Md. 314 (2013), the State contends that Leopold's probation condition is a "narrowly tailored punishment which relates directly to the offenses at the core of his conviction" and, therefore, should be upheld. *Henson*, however, is distinguishable because, in that case, the challenged condition was "working in any capacity in election campaigns[,] whether it's in a voluntary status or paid." *Id*. at 327. In upholding Henson's probation condition, Judge Matricciani, speaking for this Court, stated:

> And importantly, appellant's profession—campaign consultant—is not one subject to State licensing requirements. There being no other legitimate control over his political activities, we leave in place the court's narrowly tailored, rational special condition that appellant not work in "any capacity in election campaigns" during the term of his probation. *See Towers v. State*, 92 Md. App. 183, 194, 607 A.2d 105 (1992).

*Id.* at 330-31 (emphasis added). Because, as previously explained, there exists a

26

comprehensive statutory scheme governing the eligibility and removal of public officials

in Maryland, we strike the portion of Leopold's sentence that prohibits him from "be[ing]

a candidate for any local, state, or federal elected office."

> **JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED IN PART AND VACATED IN PART AS EXPLAINED IN THE OPINION. COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**